[No. D031965. Fourth Dist., Div. One. Jan. 12, 2000.]

CALPROP CORPORATION et al., Plaintiffs and Appellants, v. CITY OF SAN DIEGO, Defendant and Respondent.

[No. D032263. Fourth Dist., Div. One. Jan. 12, 2000.]

ANN N. PETERSEN et al., Plaintiffs and Appellants, v. CITY OF SAN DIEGO, Defendant and Respondent.

[No. D032642. Fourth Dist., Div. One. Jan. 12, 2000.]

EAST ELLIOTT PROPERTY OWNERS ASSOCIATION, Plaintiff and Appellant, v. CITY OF SAN DIEGO et al., Defendants and Respondents.

**COUNSEL**

Andersen & Keleher and G. Steven Andersen for Plaintiffs and Appellants in No. D031965.

Richard C. Wildman, Jr., for Plaintiffs and Appellants in Nos. D032263 and D032642.

Casey Gwinn, City Attorney, Anita M. Noone, Assistant City Attorney, and Anthony J. Shanley, Deputy City Attorney, for Defendants and Respondents.

**OPINION**

**BENKE, J.**—In these consolidated cases the plaintiff property owners argue the defendant city has taken their land by virtue of a series of planning decisions it made with respect to the area where the plaintiffs' land is located. As it did in the trial court, the city contends that it has not acted upon any proposed development of the parcels in a manner which demonstrates the level of development, if any, the city is willing to permit on the plaintiffs' land. Thus, the city argues the plaintiffs' takings claim are not ripe. We agree with the city and affirm the trial court's judgments entered on orders granting the city's motions for summary judgment.

FACTUAL BACKGROUND

A. *1960-1971*

These appeals concern an undeveloped portion of the City of San Diego formerly part of a naval reservation known as Camp Elliott and now known

as the East Elliott community. It is a large tract bounded by State Route 52 and Mission Trails Regional Park on the south, the City of Santee on the east and Miramar Marine Air Station on the north and west.

In 1964, after litigation with the city with respect to the appropriate parcelization of the land, the federal government offered land in East Elliott for sale to the public. More than 100 parcels offered by the government were in fact purchased by a number of individuals. Plaintiffs and appellants Calprop Corporation et al. (collectively Calprop unless otherwise specified) are all either purchasers of those parcels or their successors.

In 1971 defendants and respondents City of San Diego et al. (the city) adopted a community plan and zoning ordinances for East Elliott which designate it for low-density residential development and open space. The 1971 plan and ordinances permit no more than five residential units per acre on 1,380 developable acres. The 1971 planning for the area contemplated development of estate-type residences and reservation of open space.

For a number of years the County of San Diego (county) has operated a landfill within the East Elliott area on approximately 472 acres which it owns.

B. *1981-1987*

In 1981 the city acknowledged to property owners in East Elliott that the 1971 community plan for the area needed to be updated. However, because of limited resources, the city advised the property owners that it would not be able to prepare an updated plan within the following year. The city therefore invited the property owners to retain a private planning consultant to prepare a plan update. The city further proposed that it would work with the consultant in preparing the workshops and hearings needed to gain approval of an updated plan.

None of the East Elliott property owners immediately responded to the city's proposal for a community plan update prepared by a private consultant. However by 1986 plaintiff and appellant East Elliott Property Owners Association (EEPOA) had been formed and had retained a planning consultant. EEPOA consisted of all property owners in East Elliott. In June 1987 EEPOA's consultant submitted to the city a proposed plan update which would have increased the density of development permitted in the area.[1]

---

[1]Also in 1987 one property owner in the area, Midwest Television, Inc., submitted a specific plan for development of its property. The city council formally rejected the plan

## C. *1987-1992*

Between 1987 and 1992 EEPOA and city planners attempted to work out conflicts between the development desires of the property owners and what the city's staff believed were the requirements of various resource protection enactments, including the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and the city's own Resource Protection Ordinance (RPO). According to city staff the updated plan initially proposed by the EEPOA was not acceptable because it did not satisfy the requirements of these environmental measures and the parties' attempt to develop a plan which met those requirements was twice delayed at the request of the EEPOA. Once EEPOA was unable to pay the city the ongoing cost of processing the plan and once the prospective listing of the gnat-catcher as endangered would have altered the requirements of the plan.

At no point following the identification by city staff of deficiencies in the proposed plan update did the EEPOA ask that any version of its plan be formally considered by either the city planning commission or the city council. Rather, the EEPOA and the city staff attempted to work out their differences cooperatively. Nonetheless, throughout the planning process the EEPOA consistently advised city staff that it did not believe the resource protection measures which would otherwise limit development in East Elliott applied to its members' property.

## D. *1993-1996*

In January 1993 the city council directed the city's planning department to stop processing the EEPOA's proposed plan update because the city was considering siting a city operated landfill adjacent to the county's landfill in East Elliott.

While the city was considering whether to site a landfill at East Elliott, some of the property owners developed a plan to operate a private landfill. Those owners withdrew from EEPOA and formed plaintiff and appellant Calprop. Although Calprop initially planned to ask the city to approve a planned district ordinance for the private landfill, it was encouraged by city planners to instead apply for an amendment to the East Elliott plan and a conditional use permit (CUP) which would allow operation of a landfill on its property. Calprop filed its application in August 1995.

---

because the proposal did not conform with existing zoning, was not compatible with development in the area, and would threaten environmentally sensitive resources. In recommending that the proposal be rejected, the planning department also noted that any change in the community plan should not be done in a piecemeal fashion but as part of a comprehensive update to the plan.

The city completed its study of the need for additional landfill in the region and potential sites for landfills in late 1995. As a result of the studies, the city concluded that the existing landfill at the Miramar Marine Corps Air Station would be sufficient to meet the city's foreseeable needs.

In March 1996, on the strength of a staff recommendation that it be rejected because there was no current need for a privately operated landfill in the city, the planning commission denied Calprop's application for an amendment to the East Elliott community plan and for a CUP. Thereafter in July 1996 the city council rejected Calprop's appeal from the planning commission's decision.

## Procedural History

On October 3, 1996, Calprop filed a complaint against the city in which it challenged the city's denial of its plan amendment by way of both administrative and ordinary mandate. Calprop alleged that it was acting on behalf of a class of similarly situated landowners. Significantly, Calprop sought damages for inverse condemnation.

On October 6, EEPOA and one individual property owner, Ann N. Petersen, filed complaints against the city in which they alleged that the city had acted improperly in failing to adopt an updated plan which would permit them to develop their property. They alleged claims for inverse condemnation, mandate with respect to Calprop's proposed amendment, and breach of contract with respect to the city's failure to adopt the plan update proposed by EEPOA's consultant.

In March 1997, while the plaintiffs' claims against the city were pending, the city adopted a multispecies conservation plan (MSCP) and entered into an agreement with the United States Fish and Wildlife Service which requires it to follow the MSCP. In conjunction with adoption of the MSCP, the city amended the East Elliott plan so that it conforms with the city's responsibilities under the MSCP. In general, under the MSCP development in East Elliott will be reduced from the levels permitted under the 1971 East Elliott plan. In adopting the MSCP the city noted that such a reduction had already occurred in large measure on a de facto basis because the county has purchased a substantial amount of land previously designated for residential development and has reserved it for expansion of its landfill.

The trial court consolidated the Calprop, EEPOA and Petersen complaints. The trial court denied Calprop's motion to certify a class and we affirmed its order. (*Calprop. Corp. v. City of San Diego* (May 17, 1999, D030089)

[nonpub. opn.].) The trial court denied Calprop and EEPOA any relief on their requests for administrative and ordinary mandamus. The trial court also sustained without leave to amend the city's demurrer to EEPOA's breach of contract claim.

With respect to the remaining claims for damages on the grounds that the city's conduct amounted to a taking, the city moved for summary judgment on the grounds those claims were not ripe. The trial court granted the city's motions as to all the plaintiffs and judgments in its favor were entered. The plaintiffs filed timely notices of appeal.

ISSUES ON APPEAL

On appeal, Calprop, EEPOA and Petersen do not challenge the trial court's disposition of any of their claims other than dismissal of their inverse condemnation causes of action. Rather, in almost identical terms, all the plaintiffs argue they have ripe claims that the city's conduct has amounted to a taking of their property. Because Calprop, EEPOA and Petersen raise the identical contentions on appeal, we have consolidated their appeals.

DISCUSSION

I[2]

*Ripeness*

The doctrine of ripeness was fully discussed by the Supreme Court in *MacDonald, Sommer & Frates v. Yolo County* (1986) 477 U.S. 340, 348-353 [106 S.Ct. 2561, 2565-2568, 91 L.Ed.2d 285] (*MacDonald*): "The regulatory takings claim advanced by appellant has two components. First, appellant must establish that the regulation has in substance 'taken' his property—that is, that the regulation 'goes too far.' [Citations.] Second, appellant must demonstrate that any proffered compensation is not 'just.'

"It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the

[2]The standard governing our review of an order granting summary judgment is by now familiar and well established: "In reviewing an order granting summary judgment, we must assume the role of the trial court and redetermine the merits of the motion. In doing so, we must strictly scrutinize the moving party's papers. [Citation.] The declarations of the party opposing summary judgment, however, are liberally construed to determine the existence of triable issues of fact. [Citation.] All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment. [Citation.]" (*Barber v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 562 [42 Cal.Rptr.2d 697].)

type and intensity of development legally permitted on the subject property. A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes. As Justice Holmes emphasized throughout his opinion for the Court in *Pennsylvania Coal Co.* v. *Mahon* [(1922)] 260 U.S. [393,] 416 [43 S.Ct. 158, 160, 67 L.Ed. 322], 'this is a question of degree—and therefore cannot be disposed of by general propositions.' [Citation.] To this day we have no 'set formula to determine where regulation ends and taking begins.' [Citation.] Instead, we rely 'as much [on] the exercise of judgment as [on] the application of logic.' [Citation.] Our cases have accordingly 'examined the "taking" question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the governmental action—that have particular significance.' [Citations.] Until a property owner has 'obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property,' 'it is impossible to tell whether the land retain[s] any reasonable beneficial use or whether [existing] expectation interests ha[ve] been destroyed.' [Citation.] As we explained last Term: '[T]he difficult problem [is] how to define 'too far,' that is, how to distinguish the point at which regulation becomes so onerous that it has the same effect as an appropriation of the property through eminent domain or physical possession. . . . [R]esolution of that question depends, in significant part, upon an analysis of the effect the Commission's application of the zoning ordinance and subdivision regulations had on the value of respondent's property and investment-backed profit expectation. That effect cannot be measured until a final decision is made as to how the regulations will be applied to respondent's property.' [Citation.]

"For similar reasons, a court cannot determine whether a municipality has failed to provide 'just compensation' until it knows what, if any, compensation the responsible administrative body intends to provide. [Citation.] The local agencies charged with administering regulations governing property development are singularly flexible institutions; what they take with the one hand they may give back with the other. In *Penn Central Transportation Co.* v. *New York City* [(1978) 438 U.S. 104 [98 S.Ct. 2646, 57 L.Ed.2d 631]], for example, we recognized that the Landmarks Preservation Commission, the administrative body primarily responsible for administering New York City's Landmarks Preservation Law, had authority in appropriate circumstances to authorize alterations, remit taxes, and transfer development rights to ensure the landmark owner a reasonable return on its property. [Citation.] Because the railroad had 'not sought approval for the construction of a smaller structure' than its proposed 50-plus story office building [citation], and because its development rights in the airspace above its Grand Central

Station Terminal were transferable 'to at least eight parcels in the vicinity of the Terminal, one or two of which ha[d] been found suitable for the construction of a new office building,' [citation], we concluded that 'the application of New York City's Landmarks Law ha[d] not effected a "taking" of [the railroad's] property.' [Citation.] Whether the inquiry asks if a regulation has 'gone too far,' or whether it seeks to determine if proffered compensation is 'just,' no answer is possible until a court knows what use, if any, may be made of the affected property.

"Our cases uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it. Thus, in *Agins* v. *Tiburon,* 447 U.S. 255 (1980) [100 S.Ct. 2138, 65 L.Ed.2d 106], we held that zoning ordinances which authorized the development of between one and five single-family residences on appellants' 5-acre tract did not effect a taking of their property on their face, and, because appellants had not made application for any improvements to their property, the constitutionality of any particular application of the ordinances was not properly before us. [Citation.] Similarly, in *San Diego Gas & Electric Co.* v. *San Diego,* 450 U.S. 621 [101 S.Ct. 1287, 67 L.Ed.2d 551] (1981), we dismissed the appeal because it did not appear that the city's rezoning and adoption of an open space plan had deprived the utility of all beneficial use of its property. [Citation.] Because the California Court of Appeal had 'not decided whether any taking in fact ha[d] occurred, . . . further proceedings [were] necessary to resolve the federal question whether there has been a taking at all.' [Citation.] As a consequence, the judgment was not final for purposes of our jurisdiction under 28 U. S. C. § 1257. [Citation.] Most recently, in *Williamson Planning Comm'n* v. *Hamilton Bank* [(1985) 473 U.S. 172 [105 S.Ct. 3108, 87 L.Ed.2d 126]], we held that the developer's failure either to seek variances that would have allowed it to develop the property in accordance with its proposed plat, or to avail itself of an available and facially adequate state procedure by which it might obtain 'just compensation,' meant that its regulatory taking claim was premature.

"Here, in comparison to the situations of the property owners in the three preceding cases, appellant has submitted one subdivision proposal and has received the Board's response thereto. Nevertheless, appellant still has yet to receive the Board's 'final, definitive position regarding how it will apply the regulations at issue to the particular land in question.' [Citation.] In *Agins, San Diego Gas & Electric,* and *Williamson Planning Comm'n,* we declined to reach the question whether the Constitution requires a monetary remedy to redress some regulatory takings because the records in those cases left us uncertain whether the property at issue had in fact been taken. Likewise, in

this case, the holdings of both courts below leave open the possibility that some development will be permitted, and thus again leave us in doubt regarding the antecedent question whether appellant's property has been taken." (Fns. omitted.)

## II

### *Futility*

■ Importantly, courts have recognized the ripeness requirement cannot be used to require that property owners resort to "piecemeal litigation or otherwise unfair procedures." (*MacDonald, supra*, 477 U.S. at p. 350, fn. 7 [106 S.Ct. at p. 2567]; *Del Monte Dunes v. City of Monterey* (9th Cir. 1990) 920 F.2d 1496, 1501 (*Del Monte I*); see also *Monterey v. Del Monte Dunes at Monterey, Ltd.* (1999) 526 U.S. 687, 698-699 [119 S.Ct. 1624, 1633, 143 L.Ed.2d 882] (*Del Monte II*).) The Ninth Circuit "recognizes a limited futility exception to the requirement that a landowner obtain a final decision regarding the application of land use regulations to the affected property. [Citation.] Under this exception, the resubmission of a development plan or the application for a variance from prohibitive regulations may be excused if those actions would be idle or futile. [Citations.] The landowner bears the burden of establishing, by more than mere allegations, the futility of pursuing any of the steps needed to obtain a final decision. [Citation.] Moreover, before claiming the exception, the landowner must submit at least one development proposal and one application for a variance if meaningful application and submission can be made. [Citations.]" (*Del Monte I, supra*, 920 F.2d at p. 1501.)

In *Del Monte I*, the property owners and their predecessors began seeking development from the defendant city in 1981. As summarized by the court, "The city council finally specified in 1984 the development it would permit on the property. The appellants spent over 18 months preparing a plan to meet the conditions specified. The plan was approved in the architectural review, was recommended by the City's professional planning staff, and then the same three members of the city council that had approved the development with certain conditions abruptly changed course and disapproved the plan even though the conditions specified had been substantially met. The City now appears to expect appellants to submit a fresh application rather than continue refining the plan into which appellants have expended significant resources. This disapproval of the plan came at a time when a sewer moratorium from another agency would prevent development based on new plans, thus, further delaying or restricting development.

"Requiring appellants to persist with this protracted application process to meet the final decision requirement would implicate the concerns about

disjointed, repetitive, and unfair procedures expressed in *MacDonald,* 477 U.S. at 350 n. 7, 106 S.Ct. at 2567 n. 7, and *American Savings and Loan* [*Ass'n v. County of Marin* (1981)] 653 F.2d [364,] 371. The City, after extended processes, set forth the development it would permit, with express conditions. Appellants have provided evidence that they substantially fulfilled these conditions. We therefore conclude that further reapplication is not required and that the taking component of appellants' claim is sufficiently ripe for review." (*Del Monte I, supra,* 920 F.2d at p. 1506, fn. omitted.)

The futility exception as articulated in California cases has largely followed the pattern described by the Nineth Circuit in *Del Monte I.* That is, our cases have recognized that the exception is narrow and that it requires some development proposal by the landowner and that only when, by way of its response to the proposal, a governmental agency has as a practical matter defined what development will be allowed may a court then determine whether there has been a taking. "The futility exception is extremely narrow: '[T]he mere possibility, or even the probability, that the responsible agency may deny the permit should not be enough to trigger the excuse. [Citations.] To come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so).' [Citation.] . . . [W]here a 'general plan does not preclude all development,' futility cannot be demonstrated in the absence of a development proposal that 'conforms to the existing general plan or at least does not require as drastic a modification to present land use designations as an amendment to the general plan.' [Citation.]" (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 327 [82 Cal.Rptr.2d 649] (*Toigo*), quoting *Milagra Ridge Partners, Ltd. v. City of Pacifica* (1998) 62 Cal.App.4th 108, 117 [72 Cal.Rptr.2d 394] (*Milagra*).)

In *Toigo,* the plaintiff landowner twice proposed the subdivision of her property and twice her proposals were rejected by the local town council. On both occasions the town council found that the proposals were inconsistent with the town's general plan and zoning ordinances. In finding that, notwithstanding the two attempts over four years to develop the property, a further application to the city for a development permit was required before the plaintiff could pursue a regulatory takings claim, the court stated: "The problem in this case lies, as previously stated, in the fact that [plaintiff] has not explored a reduction in size, scope, or intensity of the proposed development. Therefore, the inference that is sought to be raised from Toigo's showing on summary judgment — that the Town has applied the land use criteria it administers to the particular land in question in such a draconian fashion that reapplication for a modified plan would be futile — derives from nothing more than 'speculation, conjecture, imagination or guess

work,' and is insufficient to raise a triable issue of fact. [Citation.] In this connection, the United States Supreme Court has observed that '[r]ejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews.' [Citation.] Therefore, Toigo's takings claim will not be ripe 'until it is in a position to allege not only that its initial permit applications were denied, but also that it has made some effort to pursue compromise with the [Town] that would allow some level of development.' [Citation.]" (*Toigo, supra*, 70 Cal.App.4th at p. 330.) In reaching this conclusion, the court added that "we need not determine at which point reapplications for development will become futile. Under pertinent authority, we are not required to engage in 'the virtual impossibility of determining what development will be permitted on a particular lot of land when its use is subject to the decision of a regulatory body invested with great discretion, which it has not yet even been asked to exercise.' [Citation.]" (*Id.* at pp. 331-332.)

The court in *Toigo* relied upon, among other authorities, the holding in *Milagra* where the landowners proposed a residential development which required an amendment to the existing general plan. Although the city council approved the proposed project and the general plan amendment, in a subsequent city referendum, the amendment was rejected by voters. The court found the failure of the city to adopt the plan amendment and approve the otherwise nonconforming plan did not create a ripe takings claim. (*Milagra, supra*, 62 Cal.App.4th at p. 118.) ■ "All counties and cities in California are required to 'adopt a comprehensive, long-term general plan for the physical development of the county or city . . . .' [Citation.] 'The general plan is atop the hierarchy of local government law regulating land use. It has been aptly analogized to a "constitution for all future developments." [Citation].' [Citation.] A general plan amendment alters the course of the region's future development. By contrast, a variance is an administrative or quasi-judicial act permitting minor deviations from existing land use regulations so that the landowner does not suffer undue hardship, but which does not violate the overall established land use regulatory scheme. [Citation.] We interpret *Williamson* to mean that finality for purposes of a taking claim is determined by the denial of a requested deviation from the *present* land use scheme, not the rejection of an attempt to alter a comprehensive, long-range development scheme for the entire community. [Citation.]" (*Milagra, supra*, 62 Cal.App.4th at pp. 118-119.)[3]

---

[3]Even when a final definitive decision has been made by a local agency, a landowner may not then immediately sue for damages. Rather, the landowner must obtain a judicial determination that the local agency's action amounted to a taking. (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 14-15 [32 Cal.Rptr.2d 244, 876 P.2d 1043] (*Hensler*); see also *Healing v.*

## III

### *Normal Permit Process*

■ Takings jurisprudence not only requires a final determination as to the permissible level of development for a particular parcel, but also largely relieves regulatory agencies of liability for delays which may occur while such a determination is being reached. (See *Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, 1030 [73 Cal.Rptr.2d 841, 953 P.2d 1188] (*Landgate*); *Kawaoka v. City of Arroyo Grande* (9th Cir. 1994) 17 F.3d 1227, 1233; *Guinnane v. City and County of San Francisco* (1987) 197 Cal.App.3d 862, 865, 869-870 [241 Cal.Rptr. 787].) Liability for delay in processing a development proposal may only be imposed when it goes "beyond that to be expected as part of the normal permit process." (*Hensler, supra,* 8 Cal.4th at p. 15.) The normal permit process includes the period in which a property owner must litigate with an agency "over other threshold questions that must be resolved before it can be determined whether a development should be permitted to proceed." (*Landgate, supra,* 17 Cal.4th at p. 1030.) Our Supreme Court has recognized that resolution of such threshold questions "often turns on the construction and application of complex statutory schemes and results in significant delays in the development process." (*Ibid.*) Notwithstanding the lengthy interval which may pass while such issues are resolved by way of litigation, the interval is not compensable because " 'the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking' [Citation.]" (*Id.* at p. 1027.) Rather, "a judicial determination of the validity of certain *preconditions to development* is a normal part of the development process, and the fact that a developer must resort to such a determination does not constitute a per se temporary taking." (*Id.* at p. 1030.)

---

*California Coastal Com.* (1994) 22 Cal.App.4th 1158, 1174 [27 Cal.Rptr.2d 758].) In *Hensler* a landowner sought a permit to develop a large tract of homes. Consistent with an ordinance preventing development along hillside ridge lines, the city approved the project but prohibited the landowner from using or encroaching upon the major ridge which existed on his property. Three years after obtaining approval for the project the landowner sued the city, alleging the restriction on ridge line development amounted to a taking of his property. The court held the landowner should have challenged application of the ridge line ordinance to his property by way of a timely petition for administrative mandamus (Code Civ. Proc., § 1094.5) and that his failure to do so barred his inverse condemnation action. (*Hensler, supra,* 8 Cal.4th at pp. 27-28.) " 'The requirement that challenges to administrative actions constituting takings be brought initially by administrative mandamus assures that the administrative agency will have the alternative of changing a decision for which compensation might be required. If no such early opportunity were given, and instead, persons were permitted to stand by in the face of administrative actions alleged to be injurious or confiscatory, and three or five years later, claim monetary compensation on the theory that the administrative action resulted in a taking for public use, meaningful governmental fiscal planning would become impossible.' " (*Ibid.*)

"Of course . . . a governmental agency may not evade the takings clause by fabricating a dispute over the legality of a lot, or by otherwise arbitrarily imposing conditions on· development in order to delay or discourage that development. The government agency's assertion of authority, whether or not erroneous, must advance some legitimate government purpose." (*Landgate, supra,* 17 Cal.4th at p. 1029.)

In *Landgate* a landowner wanted to develop a parcel, the borders of which had been previously altered with the permission of the county. In fact, based on the lot line adjustment, the county had built a road along one side of the lot. However, the lot line adjustment had not been approved by the California Coastal Commission. The Coastal Commission refused to approve the development permit because it believed it had jurisdiction over the lot line adjustment and it was unwilling to approve it on the merits. The landowner then brought mandate action in which it successfully established that the commission did not have jurisdiction over the lot line adjustment.

Following remand with directions not to question the validity of the lot line adjustment issue, the commission approved the developer's project. The developer then sued the commission, alleging that it had been subject to a two-year taking while it was compelled to defeat the commission's assertion of jurisdiction over the lot line adjustment. In finding that no temporary taking had occurred, the Supreme Court concluded that the plaintiff landowner "has not demonstrated that the development delay between February 1991 and February 1993 was due to anything other than a bona fide dispute over the legality of [plaintiff's] lot and the Commission's jurisdictional authority over the lot line adjustment. Such delay is an incident of property ownership and not a taking of property. [Citation.] Although [plaintiff] was in the unfortunate position of suffering from a delay not of its own making, the same can be said of any governmental mistake or, for that matter, any of a number of possible bottlenecks in the development process." (*Landgate, supra,* 17 Cal.4th at p. 1031.)[4]

---

[4]In this regard we note the recent opinion in *Mills Land & Water Co. v. City of Huntington Beach*█ (Cal.App.) (*Mills Land*). In that case the plaintiff made repeated attempts over a lengthy period of time to obtain permission for specific development proposals which were denied because of delays in adopting a land use plan acceptable to the Coastal Commission. We agree with the *Mills Land* court that in light of the planning history any further development application would have been futile. However, the court in *Mills Land* did not consider whether, notwithstanding the futility of seeking an application while the city was processing a land use plan, the city could avoid liability by showing that the planning delay served a legitimate governmental purpose. (Cf. *Landgate, supra,* 17 Cal.4th at pp. 1020-1022.)

IV

*Plaintiffs' Claims*

■ Under the foregoing principles EEPOA's and Calprop's claims that their property has been permanently taken by the city are not ripe. Notwithstanding the delays they have experienced, the record does not demonstrate that it would be futile for them to apply for permission to develop their property consistent with existing land use regulations for East Elliott. Indeed on this record there is nothing from which a trier of fact could conclude that the plaintiffs have been subject to anything other than the normal regulatory process.

### A. *Ripeness*

The record is undisputed that neither EEPOA itself nor any of its individual members has ever asked the city for approval of any proposed development on any parcel of land in the East Elliott area. Rather, EEPOA has only attempted to increase the level of development in the planning area by way of an amendment to the community plan. Because EEPOA and its members have never sought approval for any specific project, let alone one which met the existing plan and zoning requirements for the area, their claim that their property has been taken is not ripe. (*Toigo, supra*, 70 Cal.App.4th at pp. 330-331; *Milagra, supra*, 62 Cal.App.4th at pp. 118-119.)

The record is also undisputed that Calprop has only asked for an amendment to the community plan and a CUP which would permit it to operate a private landfill. The city's rejection of that proposed plan amendment does not create a ripe takings claim. The city's unwillingness to approve an intense and unique use such as a landfill does not by any stretch of the imagination establish that the city will prevent Calprop from developing its land in any economically valuable manner. (*MacDonald, supra*, 477 U.S. at pp. 348-353 [106 S.Ct. at pp. 2565-2568].) Because Calprop's proposal required an amendment to the city's then current plan for the area as well as its zoning, its ultimate rejection by the city does not indicate in any manner the level of development the city would permit under the existing plan and zoning. (See *Milagra, supra*, 62 Cal.App.4th at p. 119.)

### B. *Futility*

#### 1. *MSCP*

We of course recognize that by way of adoption of the MSCP, the city has designated East Elliott as an area it is committed to preserve largely as open

space. This decision by the city however does not make any further application by EEPOA or Calprop futile. Indeed, with respect to the open space it has designated in East Elliott, the MSCP states in pertinent part: "Open space areas which cover an entire ownership should be preserved through means that include, but are not limited to, *acquisition by the City with state and federal assistance* or by other larger property owners as mitigation lands for environmental impacts anticipated on other properties." (Italics added.) Thus the MSCP itself contemplates that in considering any proposal for development in the area, the city will have to weigh the cost of preventing development of a particular parcel and ultimately being required to compensate the landowner for doing so against the cost of permitting a level of development consistent with the landowner's rights under the Constitution and using alternative, less costly means of achieving the values embodied in the MSCP. It is precisely this choice — between paying the cost of preventing development and pursuing alternative means of advancing regulatory interests — which the regulatory takings jurisprudence has steadfastly preserved for state and local agencies. (*MacDonald, supra,* 477 U.S. at pp. 348-353 [106 S.Ct. at pp. 2565-2568]; *Landgate, supra,* 17 Cal.4th at p. 1018; *Hensler, supra,* 8 Cal.4th at pp. 14-15.) Importantly, as our discussion indicates, it is not a choice which agencies are required to make in the abstract. Rather, the cases make it clear that land use regulators must have been presented with a specific development proposal from which a final decision as to the permissible level of development can be formally adopted or at least inferred under the particular circumstances. Because EEPOA and Calprop have not made any such development proposal and received a response to it from the city, they may not at this point contend that the MSCP makes it futile to pursue development of their members' land. (*Milagra, supra,* 62 Cal.App.4th at pp. 118-119.)

## 2. *Planning Delay*

The fact the city has delayed over a very lengthy period of time in adopting a new plan and zoning for the area does not create the futility needed to establish a ripe takings claim. First, in the absence of a proposal for development which was consistent with the 1971 plan and zoning, we are in no position to conclude the city would in fact have rejected such a proposal on the grounds that it was considering alternative development regulations for the area.[5] If, during the period the city was considering alternative uses for the area, EEPOA or Calprop had presented the city with a development plan which met the existing zoning and plan requirements,

---

[5]The city's rejection of Midwest Television, Inc.'s, request for a plan amendment does not suggest what the city would have permitted without an amendment to the plan. (*Toigo, supra,* 70 Cal.App.4th at pp. 330-331; *Milagra, supra,* 62 Cal.App.4th at pp. 118-119.)

the city would have been faced squarely with the choice of weighing the property owners' right to develop their land against its need to update the plan. The law is now clear that we cannot speculate what in fact the city would have done had it been given such a choice during the planning process. (*Toigo, supra*, 70 Cal.App.4th at pp. 330-331; *Milagra, supra*, 62 Cal.App.4th at pp. 118-119.)

■  Second, even if we were to assume the city would not permit any project while it was considering development plans for the area, it is entirely lawful for a municipality to delay development of land so long as the delay substantially advances a legitimate governmental interest. (*Landgate, supra*, 17 Cal.4th at pp. 1020-1022.) In determining the legitimacy of such a delay, the alleged statements of city staff to the plaintiff's consultant, the ballot statement of an individual city council member, and the conclusion of the plaintiff's land use consultant are wholly irrelevant. As the court in *Landgate* stated: "The Court of Appeal erred in its attempt to divine, through the statements of commissioners and Commission staff and through circumstantial evidence, the 'true,' illegitimate, motive for the Commission's decision to deny Landgate's development permit. The proper inquiry is not into the subjective motive of the government agency, but whether there is, objectively, sufficient connection between the land use regulation in question and a legitimate governmental purpose so that the former may be said to substantially advance the latter. [Citations.] . . . Thus, we must determine not whether a sinister purpose lurked behind the Commission's decision, but rather whether the development restrictions imposed on the subject property substantially advanced some legitimate state purposes so as to justify the denial of the development permit." (*Id.* at p. 1022.)

■  Here, the record shows that the delay in adopting an updated plan for the area occurred while the city staff (1) negotiated with the EEPOA offer the impact and applicability of resource conservation measures in East Elliott and (2) considered the area for development as a landfill. The differences between the city staff and EEPOA over the applicability and impact of the state and local environmental measures are just the sort of threshold dispute which the court in *Landgate* held is part of the normal regulatory process. In particular, we have found nothing in the record which shows that the city staff's reliance on the RPO and CEQA were not bona fide and in good faith. Indeed, we note that although they could have asked that their plan update be considered by the planning commission and the city council notwithstanding the staff objection, EEPOA did not do so. Similarly, we are in no position to question the importance or difficulty of identifying an appropriate site for an urban landfill.

Rather, viewed objectively, we must conclude that in negotiating over the impact of the conservation requirements imposed since adoption of the 1971

plan and in investigating the landfill potential of the area, the city was advancing important interests and that the time it took in doing so while lengthy, was necessary under the circumstances. Because the delay in developing a plan was therefore part of the normal regulatory process, the delay did not give rise to any takings claim. (*Landgate, supra,* 17 Cal.4th at pp. 1020-1022.)

## CONCLUSION

The plaintiffs own property, the development of which is constrained by many circumstances outside their control and outside the control of the city. In particular we note the property was effectively subdivided by the federal government and marketed in relatively small parcels at a time when no one seriously considered immediate development in East Elliott. This circumstance has made it difficult both for the plaintiffs and the city to agree upon a comprehensive plan for the area which protects both the individual rights of the plaintiffs and the legitimate regulatory interests of the city. That is to say, if the land in East Elliott were held in larger parcels, the ability of the city to preserve substantial economic value for individual property owners without damaging the unique environment in the area would have been far simpler.

In any event, the city has now adopted a plan for the area, which, as we have noted, clearly contemplates providing compensation to landowners who cannot develop their property. Under well-established takings jurisprudence, it is now up to the landowners to present the city with specific plans for their respective parcels and in that manner provide the city with the clear choice of permitting development or providing them some form of meaningful compensation.

Judgments affirmed.

Kremer, P. J., and Nares, J., concurred.