Filed 9/6/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SUZANNE J. BLACK et al., | B285135 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS159447) |
| v. | |
| CITY OF RANCHO PALOS VERDES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Amy D. Hogue, Judge. Affirmed.

Crockett & Associates and Robert D. Crockett for Plaintiffs and Appellants.

Aleshire & Wynder, David J. Aleshire, and June S. Ailin for Defendant and Respondent.

_____

The appellants (landowners) own eight lots in an area of Rancho Palos Verdes that is the subject of a 1978 building moratorium based on the resurgence of an ancient landslide.[1] In the trial court, the landowners sought relief from the building moratorium and damages for inverse condemnation primarily on the basis of our opinion in *Monks v. City of Rancho Palos Verdes* (2008) 167 Cal.App.4th 263 (*Monks II*). Based on their erroneous interpretation of *Monks II*, the landowners did not first apply to the city for permission to build on their lots.

The landowners argued that *Monks II* absolved them of the need to exhaust administrative remedies or, alternatively, that exhausting administrative remedies would be futile. The trial court rejected those arguments and entered judgment for the city. We also reject those arguments and affirm the trial court's judgment.

---

[1] This litigation was initiated by Jason and Laura Parks, Suzanne Black and Michael Griffith, Andrea Joannou, Arizona Land Associates, Subhash and Jennifer Mendonca, Jerry and Sandra Johnson, George and Leeane Twidwell, Judith King, Neil Siegel and the Siegel and Friend Trust, Charles Parks, Jr., the S.J. Parks Trust, and Michael and Norma Nopper. Andrea Joannou dismissed her complaint on July 26, 2016. Laura and Jason Parks, Charles Parks, Jr., and the S.J. Parks Trust dismissed their complaint on August 25, 2016. Arizona Land Associates dismissed its complaint on February 14, 2017. Melinda Politeo filed a complaint in intervention and petition for writ of mandate on June 28, 2017. The Third Amended Petition and the Complaint in Intervention—the basis of the trial court's hearing—together represented eight parcels located in the area described below as "Zone 2."

## BACKGROUND

Because much of the landowners' argument relies on *Monks II* and because our holdings in *Monks II* were dependent on the background of that case, we draw on that opinion for background here.

### A. The Landslides

Between approximately 100,000 and 120,000 years ago, there was a landslide in what is now the City of Rancho Palos Verdes. The landslide covered two square miles on the south central flank of the Palos Verdes Peninsula. Until relatively recently, the landslide was inactive and presented no problems. The area became populated with homes.

In August 1957, an area in the ancient landslide, east and southeast of the landowners' lots, began to move; this area is commonly known as the Portuguese Bend landslide. Between January 1974 and March 1976, another area in the ancient landslide, south and southwest of plaintiffs' lots, began to move; this area is commonly known as the Abalone Cove landslide. Both remain active.

### B. The City's Response to the Landslides

#### 1. The Moratorium

On September 5, 1978, the city council enacted an urgency ordinance prohibiting the development of property in the ancient landslide area. The ordinance and subsequent amendments created categories of exceptions to and exclusions from the moratorium. (See Rancho Palos Verdes Mun. Code, §§ 15.20.040, 15.20.100.)

#### 2. The Ehlig Memorandum

On May 26, 1993, Perry Ehlig, the city geologist, sent a memorandum to the city's director of public works proposing that

the moratorium area be divided into eight zones for purposes of discussing remediation efforts and residential development. Ehlig explained that each zone has its own unique characteristics. "Zone 1" consists of about 550 acres of "[u]nsubdivided land unaffected by large historic landslides and [is] located uphill or to the west of subdivided areas." It is the northern most zone and curves downward to the southwest, extending to the ocean. Zone 1 is the western border for the entire moratorium area. Zone 2, which covers approximately 130 acres, consists of "[s]ubdivided land unaffected by large historic landslides"; it is located below Zone 1. "Zone 6" occupies the eastern portion of the moratorium area, covers about 210 acres, and includes parts of the Portuguese Bend landslide; it touches Zone 2's eastern border where Zone 2 is approximately 425 feet from north to south. "Zone 3," the smallest zone with about 15 acres, is "[u]nsubdivided land unaffected by large historic landslides and [is] located seaward of Sweetbay Road"; at its northern most point, Zone 3 abuts about one-fourth of the southeastern line of Zone 2. "Zone 5," approximately 90 acres in size, is "[l]and affected by the Abalone Cove landslide and adjacent land where minor movement has occurred due to loss of lateral support"; the northern portion of Zone 5 runs along the south central line of Zone 2. In short, Zone 2 is bounded by Zone 1 to the north, Zone 6 to the east, Zone 3 to the southeast, Zone 5 due south, and Zone 1 to the southwest and the west. (Zones 4 and 8 are to the east of Zone 6 and do not touch Zone 2; Zone 7 runs along the shoreline, below Zone 6.)

Ehlig's memorandum stated that certain lots in Zone 2 "could be developed without adversely affecting the stability of the large ancient landslide. In fact, if development were

4

combined with installation of additional wells, stability would be improved. Most lots can be developed with minimal grading and without a net import or export of earth. Such grading would have no impact on the stability of the deep-seated slide. [¶] Ground water is the only variable within Zone 2 which affects its stability. Zone 2 currently contacts one monitoring well and four producing[, or dewatering,] wells. Eight to ten more monitoring wells are needed to provide a detailed picture of ground water conditions within Zone 2. Four to six more producing wells are needed to better control ground water conditions. If the costs of the needed wells were funded from fees paid for permission to develop vacant lots, development would improve the stability of the large ancient landslide."

### 3. Zone 2 and the Factor of Safety

Discussions between city officials and lot owners in Zone 2 sometimes focused on the "factor of safety," a geotechnical term used to explain the stability of a parcel of land. The factor of safety is expressed as a number reflecting the relationship between the physical factors that cause instability and those that aid stability. A safety factor of 1.0 indicates that the instability forces are equal to the stability forces, and the property is therefore considered "barely stable or almost unstable." A safety factor of 1.5 means that the forces of stability are at least 50 percent greater than the forces that cause instability. An area with a factor of safety greater than 1.0 is stable by definition. Nevertheless, because a safety factor cannot be calculated with precision, a factor of at least 1.5 provides an important margin of error and is accepted as the standard factor of safety by geotechnical professionals for residential construction. A smaller margin of error—a lower factor of safety—may be appropriate for

construction if more is known about the geology of a particular area, for example, that the groundwater is under control. For purposes of our opinions in the *Monks* cases and this case, a "local" or "localized" factor of safety refers to the stability of a single lot in Zone 2; a "gross" safety factor refers to Zone 2 in its entirety.

As outlined in more detail in *Monks II*, the city continued to study Zone 2 and the potential for development after passing the moratorium, and eventually installed utilities for the vacant lots in Zone 2, namely, gas, electric, and water. The sewer system was completed in late 2001. On January 16, 2002, the plaintiffs in the *Monks* case filed an application with the city's department of planning, building, and code enforcement, requesting an exclusion from the moratorium.

### 4. Approval of Resolution No. 2002-43

On June 12, 2002, while the *Monks* plaintiffs' application was pending, the city council approved resolution No. 2002-43. The resolution, which flowed from the city's continued study of Zone 2's landslide issues, provided that "the City Council is directing City Staff to continue to deny requests for development permits for new homes in the Zone 2 area . . . until an applicant submits a complete Landslide Moratorium Exclusion application" that established a gross safety factor of 1.5 or higher. City officials understood that a geological study to determine the safety factor of Zone 2 would cost somewhere between $500,000 and $1 million, if not more.

## C. The *Monks* Litigation

### 1. *Monks I*

In light of resolution No. 2002-43, the *Monks* plaintiffs decided not to pursue their pending application for an exclusion

6

from the moratorium.  Instead, on July 10, 2002, they filed a petition for writ of administrative mandate and a complaint for inverse condemnation.

The *Monks* plaintiffs argued that the city council had abused its discretion in approving resolution No. 2002-43 and that the resolution constituted a "taking" within the meaning of article I, section 19 of the California Constitution.  The *Monks* plaintiffs stated that they "have had no opportunity to testify, to offer opinions of their own experts, or to question City officials and consultants," and if " 'the administrative record is not an adequate basis on which to determine if the challenged action constitutes a taking' . . . , plaintiffs reserve their right to take discovery and introduce additional evidence, particularly in the form of their own testimony, the testimony of experts, and the examination of City officials."

Based only on the administrative record—documents related to the May 20, 2002 hearing before the city council—and oral argument, the trial court denied the writ petition and determined that resolution No. 2002-43 did not constitute a taking.

On appeal, the city argued that the takings claim was not ripe because the plaintiffs had not exhausted their administrative remedies.  (*Monks v. City of Rancho Palos Verdes* (Feb. 23, 2005, B172698) [nonpub. opn.] at pp. 17-19 (*Monks I*).)  We reviewed exhaustion of administrative remedies and exceptions to that requirement in detail.  In the context of the *Monks* plaintiffs' challenge to "the requirement that they show a safety factor of 1.5 for the entire zone" and their argument that "a lower safety factor should be used and that the safety factor of an individual lot, not the zone, should be determinative," we found

7

that resolution No. 2002-43 and the moratorium, taken together, rendered exhaustion of administrative remedies futile. (*Monks I*, *supra*, at p. 19.) We reversed the trial court's judgment and remanded the case for a trial on the takings claim. (*Monks I*, *supra*, at pp. 7-9; *Monks II*, *supra*, 167 Cal.App.4th at p. 284.)

2.    ***Monks II***

On remand, the trial court tried the plaintiffs' takings claim. During the trial, the parties settled the plaintiffs' temporary takings claim, leaving the permanent takings claim for determination. (*Monks II*, *supra*, 167 Cal.App.4th at p. 293.) The trial court "ultimately concluded that plaintiffs' claim of a permanent taking failed because, under state nuisance law, 'the potential for significant land movement in Zone 2, however minor, can only be deemed to constitute . . . a substantial and reasonable interference [with collective social interests].' The [trial] court also found that the moratorium did 'not go too far in regulating plaintiffs' . . . interests' in light of its important nature, its negligible effect on permitted uses, and its lack of interference with plaintiffs' reasonable investment-backed expectations." (*Ibid.*)

On the second appeal, which resulted in the published opinion the landowners here rely upon so heavily, we again reversed the trial court's judgment. We concluded that by requiring the plaintiffs to establish a gross (rather than local) safety factor of at least 1.5, "the city deprived plaintiffs' land of all economically beneficial use without proving a justification therefor under state principles of nuisance or property law," and had therefore violated the state takings clause. (*Monks II*, *supra*, 167 Cal.App.4th at p. 303.) We remanded and directed the trial

8

court to "determine an appropriate remedy for the permanent taking exacted by the city." (*Id.* at p. 310.)

### 3. *Monks III*

We issued our opinion in *Monks II* in October 2008. On January 21, 2009, the city repealed resolution No. 2002-43. The city also amended the moratorium to except the *Monks* plaintiffs from the moratorium "provided[] that a landslide moratorium exception permit is approved by the director, and provided that the project complies with the criteria set forth in Section 15.20.050 (Landslide Mitigation Measures Required) . . . ." The new *Monks* exception required that "[s]uch projects shall qualify for a landslide moratorium exception permit only if all applicable requirements of this code are satisfied," and only after the particular *Monks* plaintiff "submit[ted] to the director [of city planning] any geological or geotechnical studies reasonably required by the city to demonstrate to the satisfaction of the city geotechnical staff that the proposed project will not aggravate the existing situation." (Rancho Palos Verdes Mun. Code, § 15.20.040, subd. (P).)

Although the city opted on remand "to allow plaintiffs to build homes on their lots[, p]laintiffs asserted they were also entitled to compensation for the decline in the fair market value of their properties. The trial court disagreed, stating that the city had remedied the permanent taking by repealing [resolution No. 2002-43] and enacting a new resolution allowing plaintiffs to develop their properties." (*Monks v. City of Rancho Palos Verdes* (Mar. 28, 2013, B237221) [nonpub. opn.] (*Monks III*).) We agreed with the trial court and affirmed.

9

**D.    The Landowners' Dispute – The Instant Case**

In October 2014, Andrea Joannou applied for permission to build a single-family residence on a lot she owned in Zone 2. The city responded with a completed "Geotechnical Investigation Report Review Checklist" that required "additional input" from Joannou.[2] The record does not disclose any further action on Joannou's application, and no other landowner ever applied for permission to build.[3]

On November 15, 2015, the landowners filed their original petition for writ of mandamus and complaint for inverse condemnation. After a series of demurrers and amendments to

---

[2] The checklist the city provided to Joannou states: "It is unclear from the report if the applicant is submitting the report for an exception or exclusion to the Moratorium Land Use Section of the Building Code. Please clarify."

[3] Joannou is no longer a party to this litigation. In June 2014, Joannou and the city settled a separate lawsuit regarding property Joannou owned in a *different* zone with a single-family residence that had "moved over the years since [it was built in] 1956" to a location "several hundred feet away from its original location" and onto a neighboring lot. As part of the settlement, the city agreed to credit Joannou for fees she had paid for permits to rebuild on the original lot in the event she chose to seek permits to rebuild *either on that lot or on the lot she owned in Zone 2*. Joannou submitted an application for permission to build on her Zone 2 property in October 2014. The landowners continue to rely on her application for permission to build on her Zone 2 property and the city's geotechnical investigation report review checklist as evidence of the futility of exhaustion of administrative remedies. The city's response, however, can be construed as nothing more than a request for more information from Joannou.

the petition and complaint spanning about a year, the parties stipulated to the filing of a third amended petition and complaint—the operative complaint—in March 2017 requesting a writ of mandamus ordering the city to take certain actions regarding undeveloped lots in Zone 2 and alleging a single cause of action for inverse condemnations ordering the city to take certain actions regarding undeveloped lots in Zone 2.

In November 2016, after the litigation had been pending for more than a year, Jennifer Mendonca "approached the [c]ity's planning department desk, [and was told] that in order to qualify for an exclusion to build [her] home on [her] lot in Zone 2, [Mendonca] would need to submit a geotechnical report analyzing the impact [her] home would have on the region-wide Portuguese Bend landslide, showing the proposed structure would satisfy a safety factor of 1.5." An e-mail from an assistant city planner to Mendonca dated November 29, 2016, and specifically regarding Mendonca's lot explains that "[n]o other new developments are allowed [in Zone 2], unless the applicant can demonstrate they fall under one of the Exceptions listed in [Rancho Palos Verdes Municipal Code] Chapter 15.20." The record contains no application and reflects no city response to any application submitted by or on behalf of Mendonca for any exception or exclusion.

The record also contains a November 2016 e-mail that purports to be from an associate city planner to a commercial real estate broker regarding his client's property in Zone 2. The e-mail states: "Please . . . note that because the property is within the City's Landslide Moratorium Area, you would not be able to construct a new house anywhere on this lot, even with the

11

proper geotechnical reports."[4]  The record discloses no application regarding the property about which the broker stated he inquired.

In August 2016, the city responded to a special interrogatory the landowners propounded regarding exclusions under Rancho Palos Verdes Municipal Code, section 15.20.100, with the following statement:  "To date, [the city] has not found any Landslide Moratorium Exclusions granted under Municipal Code section 15.20.100."  In February 2017, Ara Mihranian, the city's director of community development, testified that since the *Monks* case no applications for exclusion from the moratorium had been filed.[5]

---

[4] The e-mail is undated, contains no information in the "from" field, and offers no identifying information about the specific lot to which it refers.  The trial court sustained the city's objection to the e-mail and to the portion of the real estate broker's declaration purporting to contextualize and authenticate the e-mail.  The landowners have not appealed the trial court's evidentiary ruling.

[5] The record is silent regarding whether there were any applications *before* our *Monks* opinions.  The record indicates that Neil Siegel purchased his property in the early 1990's and "periodically re-engaged . . . over the years" with the city's director of planning regarding permission to build on his lot.  "The substance of those communications," according to Siegel, "was that 'his hands were tied[,]' and that the City Council would be establishing requirements for how to go about obtaining permission to develop, that at present no procedure existed for obtaining permission to develop this lot, but that the City Council would eventually establish such procedures; but that no application for development of this lot could be accepted by his office at this time."  Siegel's declaration, dated February 9, 2017,

12

On July 28, 2017, the trial court conducted a hearing on the petition for writ of mandamus and complaint.  The trial court denied the petition for writ of mandate and found that the landowners had failed to demonstrate that the moratorium constituted an unlawful taking.  In the trial court's view, the landowners did not demonstrate that the moratorium, "on its face, prevent[ed] all economic use of properties located in Zone 2."  The trial court further noted that the landowners needed to "exhaust administrative remedies before the [trial court could] determine whether, as applied to the[ landowners'] properties and their intended uses for the properties, there is an unlawful taking."

On August 22, 2017, the trial court entered judgment for the city.  The landowners timely appealed.

## DISCUSSION

The landowners contend that they do not challenge the trial court's determination regarding exhaustion of administrative remedies.  They "instead challenge the constitutionality of the moratorium."  In so doing, however, the landowners necessarily challenge the trial court's determination that they must exhaust administrative remedies.  We explain below.

### A.    Constitutional Challenge

Assuming the landowners do not challenge the trial court's determination that they must exhaust, but have not exhausted, administrative remedies, the landowners' constitutional

---

does not specify when "at present" and "at this time" were in the context of Siegel's "periodic re-engagement" over the three referenced decades.

challenge to the moratorium is a facial challenge.  (See *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 11 (*Hensler*).)  Unless and until there is an administrative application of the moratorium or evidence establishing the futility of exhaustion, we have no means to determine the constitutionality of that application.

But the basis of the landowners' facial challenge to Rancho Palos Verdes Municipal Code, chapter 15.20 is not clear from the landowners' briefs.  The challenge appears to be based on our finding in *Monks II* that the moratorium coupled with the city's then-existing resolution No. 2002-43 constituted a categorical taking.  (See *Monks II, supra*, 167 Cal.App.4th at p. 305.)

The Rancho Palos Verdes Municipal Code lays out a detailed administrative procedure by which an applicant can seek an exclusion from the city council.  To grant an exclusion the city council must determine, among other things, that "[t]he exclusion shall not aggravate any existing geologic conditions in the area." (Rancho Palos Verdes Mun. Code, § 15.20.100, subd. (C)(3).)  *This* is the portion of the moratorium that the landowners contend makes the moratorium facially unconstitutional.  In *Monks*, however, we were considering that language in the context of resolution No. 2002-43, which provided that the city's final decision on an application for an exclusion *would be* to "continue to deny requests for development permits for new homes in the Zone 2 area . . . until an applicant submits a complete Landslide Moratorium Exclusion application" that established a gross safety factor of 1.5 or higher.  The city has repealed resolution No. 2002-43, and the record contains no indication of how the city would ultimately decide an application for exclusion. Furthermore, there is nothing about the language of the

14

statute—absent the offending and repealed resolution—that commands the outcome the landowners urge.

*Monks II* is not dispositive, and application of our finding in *Monks II* to a changed set of circumstances is not appropriate or persuasive. Furthermore, neither the landowners' arguments nor our review of the moratorium in the city's municipal code reveal facial constitutional infirmity. (See also *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.)

## B. Exhaustion of Administrative Remedies

### 1. *Stare Decisis*

Although the landowners claim to be challenging only the constitutionality of the moratorium, they argue at length about exhaustion of administrative remedies.[6] The landowners contend that *Monks II* absolves them of the responsibility for exhausting administrative remedies under the doctrine of *stare decisis*. We disagree.

Our holding in *Monks II* was about the moratorium *in the context of a city council resolution that required Zone 2 property owners to establish a gross* (or region-wide as opposed to local, or single-lot only) *safety factor of 1.5 or higher as a condition of construction*. (*Monks II*, *supra*, 167 Cal.App.4th at pp. 278-279.) "[I]n *Monks I*, we held that plaintiffs were excused from

---

[6] The landowners reiterate in their reply brief that their challenge to the moratorium is a facial challenge. However, having found no facial constitutional infirmity on our own review and having no facial constitutional infirmity identified for us, we can only conclude that the landowners' challenge is to the city's potential future application of the moratorium (absent the resolution at issue in *Monks II*) if a fact-specific application for exclusion is ever presented.

exhausting their administrative remedies—from having to establish a *gross* safety factor of 1.5—on the ground of futility. The city council had already decided that Zone 2 had a safety factor *less than* 1.5 and was not going to be persuaded otherwise. We stated that plaintiffs should not be required to pay between $500,000 and $1 million to conduct a study in an attempt to prove what the city would not believe. Thus, the use of the administrative process was pointless." (*Id.* at p. 304, original italics.)

In *Monks II*, we noted that the evidence about the administrative requirements had not changed, and we therefore applied *Monks I*'s futility determination as the law of the case in *Monks II*. (*Monks II*, *supra*, 167 Cal.App.4th at p. 304.) We said: "The gist of the evidence did not change. At the trial, plaintiffs simply offered *more* evidence that a *local* safety factor was geologically acceptable and that their lots had a safety factor of at least 1.5; the city asserted again that, under the resolution, plaintiffs had to prove a *gross* safety factor and offered *more* evidence that the safety factor of Zone 2 was less than 1.5. And no one [citation] provided any additional evidence about the cost of determining the *gross* safety factor of *Zone 2*. In these circumstances, it would make a mockery of the principle of finality . . . if, after we remanded the takings claim for a trial on the merits, the trial court found instead that plaintiffs should seek an exclusion under the resolution a second time, using the same administrative process as before." (*Ibid.*)

On January 21, 2009, the city repealed the resolution that commanded the outcomes in our *Monks I* and *Monks II* opinions. Neither the record nor our review of the city's municipal code reveals any evidence that the city continues to require property

16

owners to demonstrate a gross safety factor of at least 1.5 as a condition of construction. Our opinion in *Monks II* dealt almost exclusively with resolution No. 2002-43 and how it implemented the moratorium. We did *not* in that case consider the moratorium *outside* the context of that resolution. Because " 'cases are not authority for propositions not considered,' " (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388) *Monks II* is not dispositive of the exhaustion of administrative remedies question here.

## 2. Futility of Exhaustion of Remedies

"The Ninth Circuit 'recognizes a limited futility exception to the requirement that a landowner obtain a final decision regarding the application of land use regulations to the affected property. . . . Under this exception, the resubmission of a development plan or the application for a variance from prohibitive regulations may be excused if those actions would be idle or futile. . . . The landowner bears the burden of establishing, by more than mere allegations, the futility of pursuing any of the steps needed to obtain a final decision. . . . Moreover, before claiming the exception, the landowner must submit at least one development proposal and one application for a variance if meaningful application and submission can be made. . . .' [Citation.] [¶] . . . [¶]

"The futility exception as articulated in California cases has largely followed the pattern described by the [Ninth] Circuit . . . . That is, our cases have recognized that the exception is narrow and that it requires some development proposal by the landowner and that only when, by way of its response to the proposal, a governmental agency has as a practical matter defined what development will be allowed may a court then

17

determine whether there has been a taking.  'The futility exception is extremely narrow:  "[T]he mere possibility, or even the probability, that the responsible agency may deny the permit should not be enough to trigger the excuse. . . . .  To come within the exception, a sort of inevitability is required:  the prospect of refusal must be certain (or nearly so)." . . .' "  (*Calprop Corp. v. City of San Diego* (2000) 77 Cal.App.4th 582, 593-594.)

The landowners' stated justifications for not exhausting remedies here are unconvincing.  The landowners rely on Joannou's application for permission to build on her Zone 2 property.  But the record contains no information about whether the city approved or denied that application, which followed a settlement between Joannou and the city regarding another of Joannou's properties that had slid several hundred feet onto a neighboring lot.

The remainder of the landowners' evidence is no more convincing.  The record contains no decisions by the city council on the ultimate question of whether anyone might build on a property located in Zone 2.  And the statements the record *does* contain appear to have all been elicited by the landowners and their counsel *after* the landowners had already filed suit.  It is specious to contend that it would be futile to exhaust administrative remedies neither having attempted to do so nor having developed a record establishing futility *before* filing suit.

We cannot determine based on the record before us that the city's response to any given application for exclusion is a foregone conclusion.  We cannot, therefore, conclude that exhaustion of administrative remedies would be futile.

### 3. Expense of Exhaustion of Remedies

The landowners also correctly point out that "courts may consider the expense of the administrative process *as one factor* in determining whether exhaustion is appropriate."[7] (*Monks I*, *supra*, B172698 at p. 18, italics added.) But it is not the *only* factor. We found it a very persuasive factor in *Monks I*, where the parties agreed that exhausting administrative remedies would cost an individual homeowner hundreds of thousands of dollars, if not more than $1 million to reach a conclusion that resolution No. 2002-43 necessarily foreordained.

Here, however, the expense of exhaustion is summarized in the landowners' argument that they "did not want to hire architects and engineers and pay fees only to see an application for an exclusion rejected."[8] Fees to hire architects and engineers to work with a single parcel are not the "unusual expense" to which we referred in *Monks I*, where the lot owners were facing the expense of establishing the gross safety factor for a 130-acre piece of the city. Nor are they unusual expenses at all in the

---

[7] The landowners rely heavily on this language from our published opinion in *Monks II*, where it appears in the background section as a quote from *Monks I*. This language in the background section of *Monks II* should not be relied upon in any other case as anything other than background for the issues we were deciding and the law of the case in *Monks II*.

[8] At oral argument, the landowners argued that building on a Zone 2 lot would cost approximately $35 million to essentially "dig out" of the landslide. That cost, however, assuming the city would even require "digging out" of the landslide, would be a *building* cost, not an *application* cost. The evidence is relevant, therefore, *not* to the question of futility of applying for permission to build, but to the cost of building, which is not before us.

process of acquiring a building permit.  We cannot conclude from the record before us that the expense of applying for an exclusion from the city's building moratorium excuses the landowners from that administrative process.

## DISPOSITION

The judgment is affirmed.  The city is entitled to its costs on appeal.

CERTIFIED FOR PUBLICATION.


CHANEY, Acting P. J.

We concur:


BENDIX, J.


CURREY, J.*

---

*  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.