Filed 5/29/24  Young v. City of Coronado CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| ARTHUR R. YOUNG et al., as TRUSTEES, etc., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> CITY OF CORONADO, <br><br> Defendant and Appellant. | D081111 <br><br> (Super. Ct. No. 37-2018-00002255-CU-EI-CTL) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br> NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed May 9, 2024, is modified as follows:

In the first sentence of the first paragraph on page 2, the word "appellants" is replaced with the word "respondents," so that the sentence now reads:

> "After the City of Coronado (City) designated their property on Glorietta Boulevard (the property) a historic resource under its municipal code and this court upheld the administrative decision (*Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 411), plaintiffs and respondents Arthur R. Young and John A. Young, as Trustees and on behalf of the J.S. Abbott Trust, filed an inverse condemnation action alleging City's designation and application of its municipal code—

specifically its denial of a demolition permit—effected a regulatory taking of the property."

The petition for rehearing is denied.

There is no change in judgment.

O'ROURKE, Acting P. J.

Copies to:  All parties

2

Filed 5/9/24  Young v. City of Coronado CA4/1 (unmodified opinion)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| ARTHUR R. YOUNG et al., as TRUSTEES, etc.,<br><br>       Plaintiffs and Respondents,<br><br>       v.<br><br>CITY OF CORONADO,<br><br>       Defendant and Appellant. | D081111<br><br><br>(Super. Ct. No. 37-2018-00002255-CU-EI-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, James A. Mangione, Judge.  Reversed.

McDougal Boehmer Foley Lyon Mitchell & Erickson, Steven E. Boehmer, Carrie L. Mitchell and M. Anne Cirina for Defendant and Appellant.

Niddrie Addams Fuller Singh and Rupa Gupta Singh for Plaintiffs and Respondents.

After the City of Coronado (City) designated their property on Glorietta Boulevard (the property) a historic resource under its municipal code and this court upheld the administrative decision (*Young v. City of Coronado* (2017) 10 Cal.App.5th 408, 411), plaintiffs and appellants Arthur R. Young and John A. Young, as Trustees and on behalf of the J.S. Abbott Trust, filed an inverse condemnation action alleging City's designation and application of its municipal code—specifically its denial of a demolition permit—effected a regulatory taking of the property. Following a bench trial on liability, the court issued a statement of decision finding City's decision was final and ripe for review, plaintiffs' action was not barred by res judicata and/or collateral estoppel, and City effectively took their property without providing just compensation. Thereafter, a jury awarded plaintiffs $800,000 in damages: the difference between the property's fair market value without the historic designation ($2,750,000) and with the historic designation ($1,950,000), as of November 5, 2021, the start of trial.

City contends the court erred by its rulings because (1) diminution in the value of property due to a valid exercise of police powers through regulation does not constitute a taking as a matter of law; (2) plaintiffs' action was unripe, as City did not make a final determination regarding the extent of permitted development on the property, a prerequisite for an inverse condemnation claim based on a regulatory taking, and there was no basis to apply a futility exception; and (3) plaintiffs were unsuccessful in overturning City's administrative decision, making it immune from collateral attack. City's arguments as to ripeness and futility have merit. Accordingly, we reverse the judgment.

2

FACTUAL AND PROCEDURAL BACKGROUND

The basic facts and trial court proceedings leading up to City's administrative decision to declare the property a historic resource and our opinion affirming it are recounted in *Young v. City of Coronado, supra*, 10 Cal.App.5th 408. Some of this background, as well as the proceedings that took place after our decision, were covered in the trial on plaintiffs' inverse condemnation action. Because the court made findings as to plaintiffs' claim of a regulatory taking, as well as on subsidiary issues of ripeness and the futility of proceeding with City to seek alteration of the historic resource, we summarize those facts relevant to the court's findings in the light most favorable to the plaintiffs, who prevailed below. (*Felkay v. City of Santa Barbara* (2021) 62 Cal.App.5th 30, 40.)

*Plaintiffs' Development Efforts and Inverse Condemnation Lawsuit*

The plaintiff trustees of the J.S. Abbott Trust have since 1995 been the owners of the property, a small bungalow cottage on a parcel of land across the street from a golf course, built in 1924 by the Hakes Investment Company. Since 1953, when plaintiffs' grandparents acquired the property, it has been used as a rental. From its roof, the property has a panoramic view of the golf course, a lake, and the Coronado Bay. City designated the property a historic resource due to certain distinctive architectural characteristics, as well as being a strong example of the builder's work. Plaintiffs rented the property at about $3,000 to $3,200 per month. Because they anticipated changing the property from its original condition, they only spent money to service and maintain it in a rentable condition. The property is in fair but habitable condition, and it is the smallest house on the street with the least-utilized 7,200 square foot lot.

3

In 1995, plaintiffs did not have long term plans for the property. But in the early 2000's, they planned to develop then sell it and use the proceeds to improve then sell the next door property, which they also owned at the time. They did not intend to keep any of the bungalow, which did not meet property line setback requirements.

In 2013, plaintiffs found a group of investors who would assist in financing and construction. Before submitting applications, they spoke about the property line setbacks and potential plans with an unidentified person from City's planning department, who told them they would need a demolition permit because the property was over 75 years old, and have to have the Historic Resource Commission (the Commission) review the project. According to plaintiff John Young, the individual said, "If they say it's historic, you're finished; the process is over." Plaintiffs did not envision the property would be deemed historic, as it was no different from other bungalows that had been torn down. They obtained an architect's proposal for a development project, which they used to assemble an application to the Commission. They also created a document indicating potential square foot construction costs and profit, depending on the design.

In November 2013, plaintiffs submitted an application for determination of historic significance and notice of intent to demolish the property. Plaintiffs understood that if City declared the property historic and denied their demolition application, they would have to undergo a historic alteration permit process. In January 2014, the Commission conducted a meeting attended by John Young, after which it deemed the property historic because it met certain conditions. Young did not bring a lawyer to that meeting, nor was there opportunity to present or question witnesses or

4

request discovery from City. After filing their notice of intent to demolish the property, plaintiffs never again spoke with anyone from City's planning department.

Plaintiffs appealed to the Coronado City Council (the City Council), which upheld the Commission's decision. They then filed a writ petition, and the matter for three years worked its way through the court system. Plaintiffs' writ petition led to a judgment in City's favor and this court's 2017 decision (*Young v. City of Coronado*, *supra*, 10 Cal.App.5th 408) upholding that judgment. During that time, plaintiffs did not apply for a historic alteration permit.

In January 2018, plaintiffs filed an inverse condemnation complaint against City, alleging in part that its denial of their 2013 notice of intent to demolish the property constituted an unconstitutional regulatory taking.[1] Plaintiffs had not applied for a historic alteration permit as of January 2018

---

[1] Plaintiffs' complaint contained three inverse condemnation causes of action, one for regulatory taking, a second alleging arbitrary and discriminatory spot zoning, and a third alleging denial of equal protection. They dismissed all but the first cause of action before trial.

when they filed their inverse condemnation complaint, or even as of June 2019, as they considered it a "last resort" option.[2]

During the course of litigation, plaintiffs in November 2019 as a "hail mary" submitted a historic alteration permit seeking to demolish the property. The trial court stayed the inverse condemnation action pending City's decision. In response to the historic alteration permit, an assistant City planner informed plaintiffs that because the demolition would result in a potentially significant impact on a cultural resource, they would have to prepare a California Environmental Quality Act (CEQA) environmental impact report (EIR) and deposit $10,000 as well as a $77 service fee. In December 2019, counsel for City explained the CEQA requirement to plaintiffs and advised them that if they wished to design the project so as to make it eligible for a CEQA exemption, they could explore such alterations

---

[2] According to plaintiffs, at that time, not allowing demolition "was a loss to us"; in their estimation the property was "not developable, and the alteration permit was not a process that [they] really wished to pursue but [they] were driven to that." John Young testified that they did not pursue an alteration permit because "economically, it was not the best use of this property" as the property was "non-conforming" and "going to be very difficult to develop with the existing structure on it." While a historic alteration permit would have allowed plaintiffs to relocate or demolish the property, Young felt relocation was not economically feasible, and they did not think they would be able to achieve demolition. In the plaintiffs' view, the relocation or demolition was not viable and in John Young's opinion it was futile. Plaintiffs did not "look at [the historic alteration permit] in earnest" because "that wasn't what [they] wanted to do. [They] wanted to maximize the value of the property and . . . the historic alteration permit was not doing that" given the constraints by the building and lot's physical characteristics.

with an architectural firm in Coronado having expertise in the area.[3] Plaintiffs ultimately withdrew the application so as to move forward with another plan involving the property's modification, not demolition. The demolition application never went before the Commission.

Plaintiffs then asked a designer to create an alternative so as to present an economically feasible and viable design for the property. Working with City representatives, the designer came up with a plan for a second story and extension to the back of the property. In January 2021, plaintiffs submitted to City's staff preliminary plans that used the existing parapet as part of a balcony to maximize the views. The plan would have added 2,569 square feet for a garage, deck and second story. Staff did not approve the plan, which did not have required renderings, site plan or elevations, and that permit application, which was never submitted to the Commission, was deemed incomplete. Plaintiffs could have submitted the plan to the Commission in any event for review and approval, but they did not. It was John Young's view that because City's staff had already "nixed" the design, "there was no way it was going to go to the . . . Commission." Despite this, he

---

[3] In part, City's attorney explained that such a project would have to comply with Secretary of the Interior standards for treatment of historic properties. In his letter to plaintiffs, counsel also stated: "[W]hile I do not intend to address the substance of the [historic alteration permit] application, it should be noted that the statutory requirements for demolition under [Coronado Municipal Code section] 84.20.080 have not been met." The letter continued: "As just one example, the Youngs have not demonstrated that there are no alternatives to total demolition. A project involving partial demolition, a remodel and/or addition to modernize the dwelling was not addressed and may be one among many viable alternatives. The possibility of applying for one or more of the development[-]related benefits of historic designation outlined in chapter 84.10 of the City's Historic Resource Code was also not addressed or requested."

7

acknowledged that staff merely made recommendations to the Commission, and did not approve or deny historic alteration permit applications.

In April 2021, plaintiffs presented a final alteration permit with plans, by which they lost 600 square feet of space. But City's staff advised them that the application did not comply with Secretary of the Interior standards and thus did not qualify for a categorical CEQA exemption, and staff would not recommend the project's approval "as currently proposed." Staff also deemed the application incomplete, listing in a letter issues that needed addressing or clarification.[4]

Plaintiffs' April 2021 application was never submitted to the Commission for approval or denial. However, based on City's response, plaintiffs understood the absolute maximum they would be allowed was 1,073 square feet of alteration; that is, they believed they were limited to doubling

---

[4]     In part, the letter stated the project did not comply with Secretary of the Interior "specific guidance . . . regarding New Additions: [¶] It is recommended to *ensure that the addition is subordinate and secondary to the historic building and is compatible in massing, scale, materials, relationship of solids to voids, and color.* It is not recommended to *construct a new addition that is as large as or larger than the historic building, which visually overwhelms it (i.e., results in the diminution or loss of its historic character).* [¶] . . . The new addition is larger than the historic dwelling, resulting in lost or diminished historic character. The original dwelling is 1,073 square feet in size; and the new addition is 1,335 square feet, a number which does not include a proposed 595 square foot garage, and 493 square feet of deck space in front of the second story addition on the roof of the existing bungalow."

the size of the house and could not build a second story.  After this response, plaintiffs made no further attempt to again seek alteration.[5]

*City's Historic Resource Code and Alteration Permit Process*

City's Municipal Code,[6] and particularly its Historic Resource Code (Chapter 84.10), contains procedures for an owner of property declared a historic resource to apply for land use and code application benefits. (§ 84.10.010, subd. (H).)  Chapter 84.10 provides that a person must first obtain a historic resource alteration permit in compliance with chapter 84.20 before altering, relocating or demolishing a historic resource.  (§ 84.10.050.)

Chapter 84.20 pertains to historic alteration and demolition permits.  It provides that the Commission or the City Council may issue a historic alteration permit if certain required findings are made, including that the "proposed alteration will comply with the Secretary of the Interior's standards as set forth in Section 106 of the National Historic Preservation

---

[5]    At trial, John Young testified plaintiffs made no further efforts to seek approval from the Commission because it would be futile.  City objected that Young's use of the word "futile" was a legal conclusion.  In response the court asked, "When you say 'futile,' are you referring to it in its common definition?"  Young responded, "Yes. [¶] . . . [¶] As in a waste of time and effort."  The court then ruled:  "I'm going to overrule the objection.  I'm taking it as such, not on his legal opinion in any regard."  Because the futility exception to ripeness is a legal doctrine, Young's testimony on his beliefs about futility does not constitute substantial evidence to support the court's finding on that point.

[6]    Subsequent chapter and section references are to the Coronado Municipal Code.

Act of 1966." (§ 84.20.080.[7]) Any proposed demolition permit likewise must include one or more specified findings, including that "[t]he property owner has demonstrated that a thorough analysis has been undertaken for viable options for the preservation of the structure including, but not limited to, relocation, alternative land uses, increased densities within the existing building, restoration, facade easements, and potential buyers through advertisement in historic journals and magazines but there does not appear to be a solution and has resulted in considerable financial hardship to the property owner[.]"

Chapter 84.20 sets out procedures for applying for such a permit. First, an application "shall be filed with the Community Development Department" on specified forms, and "[u]pon determination of the application's completeness, the request shall be set for public hearing before the Historic Resource Commission at the next available meeting." (§ 84.20.090, subd. (A).) After providing notice of the public hearing at which the applicant/property owner or its representative must attend, the Commission "shall review the application in reference to the definitions and alteration, relocation or demolition criteria set forth in this chapter."

---

[7] In full, these findings are: "1. The proposed alteration is consistent with the purpose and intent of this chapter, the Historic Preservation Element and the General Plan. [¶] 2. The proposed alteration will not adversely affect the historical, architectural or aesthetic value of the historic resource. [¶] 3. The proposed alteration will retain the essential elements that make the historic resource significant. [¶] 4. The proposed alteration will not adversely affect the historic resource's relationship to its surroundings and neighboring historic resources. [¶] 5. The proposed alteration will comply with the Secretary of the Interior's standards as set forth in Section 106 of the National Historic Preservation Act of 1966. In the case of a proposed alteration on property located within a Historic District, the alteration does not adversely affect the character of the Historic District."

(§ 84.20.090, subds. (B), (C), (D).)

The Commission "shall . . . approve, conditionally approve or deny the request" no later than 21 days after the close of the hearing. (§ 84.20.090, subd. (E).) The Commission's decision, however, "shall only be a recommendation to the City Council," which must review the recommendation at another noticed public hearing. (§ 84.20.090, subd. (G).)

Chapter 84.20 contains a provision entitled "Exception to denial," which states: "Notwithstanding the failure to satisfy the criteria for the issuance of a historic resource alteration permit, the Commission, or City Council on appeal, may issue a permit with written findings that demonstrates that denial of the permit will result in an immediate and substantial hardship on the applicant because of conditions peculiar to the applicant, the owner of the property, attendant or resident, or because of conditions peculiar to the historic resource." (§ 84.20.100.)

*The Inverse Condemnation and Damages Trials*

In November 2021, plaintiffs' inverse condemnation regulatory takings claim proceeded to a bifurcated bench trial. Among other witnesses, plaintiffs presented City's associate planner who ran the historic preservation program. She explained that a property owner who wished to modify or demolish a historic structure was required to get the Commission's approval to do so. According to the planner, over time, City had received three applications to demolish historic resources including plaintiffs' application, and all three applications were withdrawn. Hence, during her testimony the parties stipulated that City had not granted any historic alteration permits to demolish such properties. The associate planner also testified that she ultimately advised plaintiffs that if they wanted to present a project consistent with Secretary of the Interior standards, their proposed addition

11

should be subordinate to the existing structure. The planner admitted that in her deposition she stated that staff had determined an addition more than twice the size of the bungalow would violate Secretary of the Interior standards. But she explained that she did not make decisions to grant or deny historic alteration permit applications; it was the Commission that made such decisions and the City Council on appeal. She also explained that a project could go before the Commission without City's staff recommending its approval; that the Commission did not in all instances follow staff's recommendation and both it and the City Council had in the past deviated from or did not follow staff recommendations.

During a damages phase, plaintiffs presented an expert who testified as to the fair market value of the property with and without the historic designation.

The trial court thereafter issued a statement of decision in plaintiffs' favor, finding (for reasons set out more fully below) City's actions made any further response by plaintiffs futile, and thus City's decisions were final and ripe for review.

Following a jury trial on damages, plaintiffs received a verdict in their favor for $800,000. The jury found this to be the difference between the property's fair market value without the historic designation ($2,750,000) and with the historic designation ($1,950,000), as of November 5, 2021, the start of trial.

City filed this appeal from the ensuing judgment.

## DISCUSSION

### I. *Standard of Review*

Settled standards apply on review of a judgment following a bench trial. We presume the judgment is correct, and it is City's burden to

demonstrate prejudicial error. (*Rojas v. HSBC Card Services Inc.* (2023) 93 Cal.App.5th 860, 872-873.) We review questions of law de novo and findings of fact under the substantial evidence standard. (*Id.* at p. 873.) " ' "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." ' " (*Ibid.*) We liberally construe the factual findings to support the judgment and consider the evidence in the light most favorable to plaintiffs as the prevailing parties, drawing all reasonable inferences in support of the findings. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) "It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility." (*Ibid.*)

These standards apply to inverse condemnation actions, which present mixed questions of fact and law. " 'We review the trial court's determination of the historical facts for substantial evidence; we review de novo the applicable law and application of that law to the facts.' " (*Ruiz v. County of San Diego* (2020) 47 Cal.App.5th 504, 514; see also *Felkay v. City of Santa Barbara*, *supra*, 62 Cal.App.5th at pp. 39-40.) But "[w]hen all the material facts and reasonable inferences from those facts are undisputed, and only one correct legal conclusion may be drawn from those facts, the reviewing court is not bound by the trial court's ruling." (*Ruiz*, at pp. 514-515.)

## II. *Contentions*

City challenges the trial court's conclusions and findings following the bench trial. It contends diminution in the property's value, as plaintiffs' expert testified had occurred due to the historic designation, is not a

13

compensable taking or damaging, and thus the court erred by finding City had effected a regulatory taking. It argues that because plaintiffs were unsuccessful in overturning the historic designation through mandamus (a decision this court upheld), that decision is immune from collateral attack, including by a lawsuit seeking damages for inverse condemnation. City maintains that plaintiffs' action was not final or ripe for review as the Commission never considered their historic alteration permit application so as to reach a final determination on the scope of any proposed development. It acknowledges that in making its decision, the court determined any further development applications would be futile, but it maintains the court's "analysis was based upon pure speculation related to potential development of the property because no final determination regarding the proposed development has ever been made." According to City, the mere possibility or probability that the Commission would deny their application is not enough to demonstrate that it would have been futile to proceed.

We agree with City's latter contention as to ripeness and futility. Our analysis begins and ends with those issues.

III. <em>Ripeness and Futility</em>

A. <em>Legal Principles</em>

" 'The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.] It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes. However, the ripeness doctrine is

14

primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy.  On the other hand, *the requirement should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question.*  [Citations.]'  . . .  '[A] controversy is "ripe" when it has reached . . . the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' "  (*Vandermost v. Bowen* (2012) 53 Cal.4th 421, 452.)

In the context of inverse condemnation, a claim of a regulatory taking " ' " " 'is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue,' " i.e., when "there has been a 'final, definitive position regarding' how the regulations will be applied to the land." '  [Citation.]  Thus, 'a landowner must have made at least one development proposal that has been thoroughly rejected by land[ ]use authorities and have prosecuted at least one meaningful application for a zoning variance, which has been finally denied.'  [Citation.]  This finality requirement ensures that a court can make ' "the constitutional determination whether a regulation has deprived a landowner of 'all economically beneficial use' of the property, [citation], or defeated the reasonable investment-backed expectations of the landowner to the extent that a taking has occurred." [Citation.]  Simply put, a court cannot say whether a regulation goes too far in restricting the use of property unless it

knows how far the regulation goes.' " (*Lafayette Bollinger Development LLC v. Town of Moraga* (2023) 93 Cal.App.5th 752, 778; see also *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 10; *Beach & Bluff Conservancy v. City of Solana Beach* (2018) 28 Cal.App.5th 244, 265 [challenge that an ordinance effects a taking as applied "is not ripe for adjudication until there has been a ' "final, definitive, position regarding" ' how the government will apply the challenged enactment to the complaining party's land"]; *Howard v. County of San Diego* (2010) 184 Cal.App.4th 1422, 1430 ["until there has been a 'final, definitive position' as to how the regulations will be applied to the land, a court cannot determine the extent of the economic impact, a factor that bears on the question whether a compensable taking has occurred"]; *Calprop Corp. v. City of San Diego* (2000) 77 Cal.App.4th 582, 590-591 ["an essential prerequisite to . . . assertion [of a regulatory takings claim] is a final and authoritative determination of the type and intensity of development legally permitted on the subject property"]; *York v. City of Los Angeles* (2019) 33 Cal.App.5th 1178, 1195, 1196 ["Only a final determination by the responsible agency enables a reviewing court to determine the constitutional questions [of regulatory taking, due process and equal protection] plaintiffs purport to raise in this

action"].)[8]  This court has reasoned that a final decision regarding application of regulations is necessary because " ' " 'it is impossible to tell whether the land retain[s] any beneficial use or whether [existing] expectation interests ha[ve] been destroyed.' " ' "  [Citation.]  The law requires

---

[8]     This court in *Beach and Bluff* cited *Hensler v. City of Glendale, supra*, 8 Cal.4th 1, which in turn relied on *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City* (1985) 473 U.S. 172 for ripeness principles.  (*Beach & Bluff Conservancy v. City of Solana Beach, supra*, 28 Cal.App.5th at p. 265.)  In *Williamson*, the United States Supreme Court distinguished between finality and exhaustion of administrative remedies:  "[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate."  (*Williamson*, at p. 193.)  Part of *Williamson*'s holding—that 42 United States Code section 1983 takings claims are not ripe for federal resolution until plaintiff seeks compensation through state procedures—was overruled in *Knick v. Township of Scott, Pennsylvania* (2019) 588 U.S. 180.)  But *Williamson's* finality requirement was left intact by *Knick, supra*, 588 U.S. at p. 188 ["Knick does not question the validity of [*Williamson's*] finality requirement, which is not at issue here"]) and the finality rule was reaffirmed in *Pakdel v. City & County. of San Francisco* (2021) 594 U.S. 474, 475 ["When a plaintiff alleges a regulatory taking in violation of the Fifth Amendment, a federal court should not consider the claim before the government has reached a 'final' decision"], 476-477 (per curiam).)  In *Pakdel*, the court stated *Williamson's* finality requirement is "relatively modest"; that "[a]ll a plaintiff must show is that 'there [is] no question . . . about how the "regulations at issue apply to the particular land in question." ' "  (*Pakdel*, at p. 478.)  The requirement is aimed at ensuring that a property owner "has actually 'been injured by the Government's action' and is not prematurely suing over a hypothetical harm. [Citation.]  . . .  [B]ecause a plaintiff who asserts a regulatory taking must prove that the government 'regulation has gone "too far," ' the court must first 'kno[w] how far the regulation goes.'  [Citation.]  Once the government is committed to a position, however, these potential ambiguities evaporate and the dispute is ripe for judicial resolution."  (*Pakdel*, 594 U.S. at p. 479.)

---

' "an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it." ' " (*Dryden Oaks, LLC v. San Diego County Regional Airport Authority* (2017) 16 Cal.App.5th 383, 397.)  " 'While a landowner must give a land[ ]use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development, *or the permissible uses of the property are known to a reasonable degree of certainty,* a takings claim is likely to have ripened.' " (*Howard v. County of San Diego*, *supra*, 184 Cal.App.4th at p. 1430.)

"Closely related to the 'final decision' rule is the 'futility' exception.  . . . In order to invoke the futility exception, a plaintiff must show ' "that the [agency] has declared what its ruling will be on a particular case." ' " (*Howard v. County of San Diego*, *supra*, 184 Cal.App.4th at p. 1430.) " '[U]nder the "futility exception" to the requirement of a final decision . . . the submission of another development plan is excused if such an application would be an " 'idle and futile act.' " ' [Citation.]  ' "[T]he futility exception . . . relieves a developer from submitting 'multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved.' " ' " (*Felkay v. City of Santa Barbara*, *supra*, 62 Cal.App.5th at p. 40; see also *County of Alameda* (2005) 133 Cal.App.4th 558, 568.)  The exception is " 'extremely narrow:  "[T]he mere possibility, or even the probability, that the responsible agency may deny the permit should not be enough to trigger the excuse.  [Citations.]  To come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so)." ' " (*Calprop Corp. v. City of San Diego*, *supra*, 77 Cal.App.4th at p. 594; see also *County of Alameda*, at p. 568.)  "[I]t requires some development proposal by the landowner and . . . only when, by way of its

18

response to the proposal, a governmental agency has as a practical matter defined what development will be allowed may a court then determine whether there has been a taking." (*Calprop*, at p. 594; see also *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 255, fn. 29 [narrow futility exception "exists where there is certainty as to the land's permitted use because, for example, the agency lacks discretion to permit any development or the permissible uses of the property have already been made known to a reasonable degree of certainty"].)

Applying these principles, the Court of Appeal in *County of Alameda* emphasized that a "property owner 'bears a heavy burden of showing that a regulation as applied to a particular parcel is ripe for a taking[s] claim.' " (*County of Alameda v. Superior Court*, *supra*, 133 Cal.App.4th at p. 567.) The owner "can show that a final decision has been made for ripeness purposes only when it can set forth facts that are ' "clear, complete, and unambiguous showing that the agency has drawn the line, clearly and emphatically, as to the *sole use* to which [the property] may ever be put." ' " (*Ibid.*) The *County of Alameda* court explained that before an inverse condemnation claim is ripe, a plaintiff "must have made at least one development proposal that has been thoroughly rejected by land use authorities and have prosecuted at least one meaningful application for a zoning variance, which has been finally denied." (*Id.* at pp. 567-568.) In *County of Alameda*, the property owner conceded it could not satisfy these ordinary ripeness requirements because it

19

did not submit a development proposal to the county after passage of the land use regulation at issue (Measure D). (*Id*. at p. 568.)[9]

The *County of Alameda* property owner argued it would be futile for it to submit a development plan, because, according to it, the measure made "clear precisely what uses of the Property are permissible": the ordinance left the county "with no discretion to permit any other uses" and none of the permitted uses were "economically viable." (*County of Alameda v. Superior Court, supra*, 133 Cal.App.4th at p. 568.) The owner had successfully argued below that all of the permissible uses were " 'known to a reasonable degree of certainty.' " (*Id*. at p. 569.) The Court of Appeal held such arguments "ignore[d] the purpose of the finality requirement," which was to permit the local government an " 'opportunity to decide and explain the reach of [the] challenged regulation.' " (*Ibid*.) It observed the county had not had the opportunity to explain the reach of the regulation, nor to "define concretely what sort of uses were permissible for [the] Property" under the general categories of uses (recreational or agricultural) specified in the ordinance. (*Ibid*.) Further, the *County of Alameda* court explained that "[e]ven though a land use regulation is restrictive, this alone does not render resort to

---

9 The measure involved in *County of Alameda* changed the subject property in that case from agricultural use to a " 'resource management' area," which permitted many of the same uses including agricultural and recreational uses, and very low density residential development. (*County of Alameda v. Superior Court, supra*, 133 Cal.App.4th at p. 563.) The local authorities had no discretion to vary the uses; changes could only be made by voter approval. (*Ibid*.) But the measure contained a " 'Protection of Legal Rights' " provision stating that " '[n]otwithstanding [the ordinance's] literal terms' " it would not apply to the extent a court determined a property owner was deprived of constitutional or statutory rights or privileges, and if it did not apply for those reasons, then the ordinance would permit " 'only the minimum development required by law which is most consistent with the provisions and purposes of this ordinance . . . .' " (*Ibid*.)

administrative procedures futile." (*Id*. at p. 570.) It found that under the measure, permissible uses of the property existed, and "it may be that the County's interpretation of [the measure] will make one of those uses economically beneficial." (*Ibid*.)

The *County of Alameda* court rejected the property owner's futility arguments, which relied on a declaration from a co-owner stating that none of the property's permissible uses were economically viable. (*County of Alameda v. Superior Court*, *supra*, 133 Cal.App.4th at p. 570.) It explained, based on its prior decisions, that "the declaration of a land use valuation expert does not establish futility simply by opining that there is no economically feasible use of the property under the applicable zoning regulations." (*Ibid*., citing *Milagra Ridge Partners, Ltd. v. City of Pacifica* (1998) 62 Cal.App.4th 108, 120.) Thus, " '[f]utility may not be determined "by inquiring whether any beneficial use remains or whether the regulatory regime inhibits the property's marketability. Adoption of such standards would require courts to speculate as to what potential uses may be lurking in the hopes of the property owner and in the minds of developers and city planners. This would result in the same sort of speculation that the ripeness doctrine prohibits." ' " (*County of Alameda*, at p. 570.) The *County of Alameda* court reversed a summary judgment in the property owner's favor on grounds its takings claim was not ripe, and it could not establish that resort to administrative procedures would be futile. (*Id*. at p. 571.)

This court in *Calprop Corp. v. City of San Diego*, *supra*, 77 Cal.App.4th 582 likewise found the futility exception did not apply. There, a group of property owners (EEPOA) proposed a plan update to increase development density on land designated for low-density residential development and open space. (*Id*. at pp. 587-588.) After city staff identified deficiencies in the

21

proposal, the owners did not ask that any version of its plan be formally considered by either the planning commission or city council. (*Id*. at p. 588.) Some of the property owners then formed Calprop and applied for a plan amendment and conditional use permit to operate a private landfill on the property. (*Ibid*.) The city denied the application, and thereafter amended its community plan and adopted a conservation plan reducing permitted development on the property. (*Id*. at p. 589.)

The owners brought inverse condemnation complaints, and the city obtained summary judgment on grounds their claims were not ripe. (*Calprop Corp. v. City of San Diego, supra*, 77 Cal.App.4th at p. 590.) This court upheld the summary judgment. (*Id*. at p. 598.) In part, we relied on *Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, in which the court held takings claims would not be ripe " ' "until [the plaintiff] is in a position to allege not only that its initial permit applications were denied, but also that it has made some effort to pursue compromise with the [Town] that would allow some level of development." ' " (*Calprop*, at p. 595, citing *Toigo,* at p. 330.) We observed that the *Toigo* court "added that 'we need not determine at which point reapplications for development will become futile. Under pertinent authority, we are not required to engage in "the virtual impossibility of determining what development will be permitted on a particular lot of land when its use is subject to the decision of a regulatory body invested with great discretion, which it has not yet even been asked to exercise." ' " (*Calprop*, at p. 595, citing *Toigo*, at pp. 331-332.)

In *Calprop Corp*, it was undisputed the EEPOA plaintiffs had never asked the city for approval of any proposed development on any parcel of land in the area. (*Calprop Corp. v. City of San Diego, supra*, 77 Cal.App.4th at p. 598.) "Rather, EEPOA has only attempted to increase the level of

development in the planning area by way of an amendment to the community plan. Because EEPOA and its members have never sought approval for any specific project, let alone one which met the existing plan and zoning requirements for the area, their claim that their property has been taken is not ripe." (*Ibid*.) Likewise, the city's rejection of the Calprop plaintiffs' request for a plan amendment did "not indicate in any manner the level of development the city would permit under the existing plan and zoning." (*Ibid*.)

We further pointed out that the city's adoption of the conservation plan in which it committed to preserve the area largely as open space "does not make any further application by EEPOA or Calprop futile." (*Calprop Corp. v. City of San Diego*, *supra*, 77 Cal.App.4th at pp. 598-599.) The conservation plan contemplated that in considering development proposals, the city would have to weigh the cost of preventing development and being ultimately required to compensate the landowner against the cost of permitting a level of development consistent with the landowner's rights under the Constitution and using alternative, less costly means of achieving the values embodied in the conservation plan. (*Id.* at p. 599.) We held the owners did not show the plan made it futile to pursue development, because they had not made such a development proposal and received a response to it by the city: "[L]and use regulators must have been presented with a specific development proposal from which a final decision as to the permissible level of development can be formally adopted or at least inferred under the particular circumstances." (*Ibid*.) We held that notwithstanding delays they had experienced, "the record [did] not demonstrate that it would be futile for them to apply for permission to develop their property consistent with existing land use regulations . . . ." (*Id.* at p. 598.)

23

To the contrary is *Felkay v. City of Santa Barbara*, *supra*, 62 Cal.App.5th 30, in which the Court of Appeal upheld a lower court's determination that an inverse condemnation claim was ripe for review. (*Id.* at p. 34.) There, the property owner applied for a coastal development permit for land located on a bluff top (rejected by the planning commission despite a staff recommendation that the application be approved) and also appealed to the city council, in part claiming the denial deprived him of all economic use of the property. (*Id.* at p. 35.) The Coastal Act at issue contained a narrow exception to its strict requirements in instances when a property owner claimed deprivation of the property's economic benefit or productive use. (*Id.* at pp. 38-39.) In rejecting the owner's permit, the city stated it would not permit development below a certain elevation, and that the area above that point was unbuildable. (*Id.* at pp. 35, 40.)

At trial on plaintiff's inverse condemnation claim, a city expert testified the city had " 'been telling the Applicant all along that development was not allowed on the bluff face for years' " and that the plaintiff had " 'received a denial' " for the reason that " 'there can be no development . . . below the bluff edge,' " evidence that the lower court credited. (*Felkay v. City of Santa Barbara*, *supra*, 62 Cal.App.5th at pp. 37, 40.) The lower court also found the owner had sought a variance or modification by invoking the Coastal Act's narrow exception. (*Id.* at p. 37.) The Court of Appeal found the court did not err by crediting the expert's testimony, and that substantial evidence supported the lower court's finding that plaintiffs' claim was ripe: "[Plaintiff] was not required to submit a second proposal because the city 'made plain' it would not allow any development below the 127-foot elevation and because the area above that elevation was 'not buildable.' " (*Id.* at p. 40.) These

circumstances, particularly the fact the planning commission and city council were presented with an option to waive the impact of their policies but declined, also showed the plaintiff had exhausted administrative remedies. (*Id*. at p. 41.)

With these principles and authorities in mind, we decide de novo the question of ripeness, and review for substantial evidence the factual question of futility. (*Felkay v. City of Santa Barbara*, *supra*, 62 Cal.App.5th at pp. 39-40.) " 'Under this deferential standard of review . . . we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.' " (*Felkay*, at p. 40.) As we will explain, there is no meaningful dispute plaintiffs' inverse condemnation claims are not ripe. Further, even viewing the evidence most favorably to plaintiffs, it does not support the court's application of the narrow futility exception.

B. *Plaintiffs' Claim that City's Historic Designation Worked a Regulatory Taking Is Not Ripe Because They Did Not Obtain the Commission's Final Definitive Decision on Permissible Development on the Property*

Like in *Calprop v. City of San Diego*, *supra*, 77 Cal.App.4th 582, the record is undisputed that plaintiffs did not ever actually submit a historic alteration permit, whether it be for demolition or modification, to the Commission for a final decision. (*Id*. at p. 598.) On appeal, plaintiffs acknowledge that once they learned City had never before granted permission to demolish a historic property, they withdrew their November 2021 application. They admit City deemed their second historic alteration permit application noncompliant. Though they characterize the evidence as showing their April 2021 historic alteration permit was denied, they acknowledge City's staff had in fact advised them it did not comply with

25

relevant standards (triggering preparation of an EIR) and also assertedly restricted any addition to a certain size, leading plaintiffs to decide there was no point in proceeding in part because the permitted addition would not be economically feasible. John Young's own testimony is consistent with these concessions.

As a result, plaintiffs have not gone through a public hearing process or an appeal of the Commission's decision/recommendation to the City Council. The statements or recommendations of staff—which plaintiffs and their designer subjectively took as a denial of their development plan—cannot constitute a final decision because, as the associate planner explained, she did not grant or deny historic alteration permit applications, and a final decision as to the extent of permitted modification or development cannot be issued until plaintiffs submit such an application to the Commission. Plaintiffs cite no case where a court concluded that a government agency reached a "final decision" before the landowner even applied for a permit, or that a government official's preliminary statements or recommendations concerning proposed modifications presented in a preliminary fashion

constitute a definitive decision so as to demonstrate their claim is ripe for review.[10]

On this record, plaintiffs have not met their "heavy burden" (*County of Alameda v. Superior Court, supra*, 133 Cal.App.4th at p. 567) of showing City's application of the historic preservation regulations to their property is ripe for a takings claim. The record is absent evidence that plaintiffs "made at least one development proposal that has been *thoroughly* rejected by land use authorities and . . . prosecuted at least one meaningful application for a . . . variance, which has been finally denied." (*Id*. at pp. 567-568, italics added.) Nor is there evidence of a " 'final, definitive position regarding' how the regulations will be applied to the [property]." (*Hensler v. City of Glendale, supra*, 8 Cal.4th at p. 10; *Beach & Bluff Conservancy v. City of Solana Beach, supra*, 28 Cal.App.5th at p. 265; *Howard v. County of San Diego, supra*, 184 Cal.App.4th at p. 1430.) Notably, because they never took

_____

10    Plaintiffs cite *County of Alameda, supra*, 133 Cal.App.4th 558, which makes clear that an owner shows futility in submitting further applications " ' "when the manner in which the *first application* was rejected makes it clear that no project will be approved." ' " (*Id*. at pp. 568-569.) But plaintiffs did not submit, and the Commission did not deny, any permit application. They also cite *Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, where the property owner submitted a subdivision application, which the county planning commission denied, and also filed an appeal, which the county board of supervisors likewise denied. (*Id*. at p. 1287.) Because the county in *Dunn* "made it clear that [applicable regulations] effectively limit the development of the [owner's] property to one residence" his takings claim was ripe for adjudication even absent submission of another permit to develop a single family residence. (*Id*. at pp. 1229-1300.) The evidence does not support a finding that plaintiffs knew " '*to a reasonable degree of certainty*' " (*Howard v. County of San Diego, supra*, 184 Cal.App.4th at p. 1430) what the Commission would decide or that the Commission had clearly and emphatically drawn the line (*County of Alameda*, at p. 567) as to permissible development of plaintiffs' property.

any historic alteration permit application to fruition, plaintiffs did not avail themselves of the regulation permitting the Commission or the City Council on appeal to issue a permit "[n]otwithstanding [plaintiffs'] failure to satisfy the [permit] criteria" on a showing that denying their permit would "result in an immediate and substantial hardship" on them "because of conditions peculiar to [plaintiffs] . . . or because of conditions peculiar to the historic resource."  (§ 84.20.100.)

Plaintiffs argue substantial evidence shows it "would have been futile for [them] to continue to submit further applications to demolish, alter, or develop the [p]roperty, *making their claim ripe*."  (Italics added.)  They misconstrue the record by saying they had "objective evidence the City had never approved demolition of a property after designating it historic."  While that was counsel's stipulation, it was based on evidence that the Commission had never considered a request to demolish a historic structure *because all of the applicants had withdrawn their applications*.  Such evidence does not support or permit an inference that it would have been futile to proceed before the Commission with an application to demolish the property because the Commission had already made clear what it would have decided.

It is a question of law whether plaintiffs' claim has ripened; in the absence of the Commission's final decision as to the extent of permissible development, it has not.  A court would thus issue an "advisory opinion" (*Vandermost v. Bowen, supra*, 53 Cal.4th at p. 452) on the constitutionality of City's historic preservation regulations.  (Accord, *Surfrider Foundation v. Martins Beach 1, LLC* (2017) 14 Cal.App.5th 238, 258 [declining to issue an advisory opinion regarding the constitutionality of a hypothetical decision on a coastal development permit application regarding closure of a beach before

the County or Coastal Commission was given an opportunity to render a decision].)

C. *The Trial Court's Futility Findings Are Not Supported by Substantial Evidence in the Record*

In finding City's decision was final and ripe for review, the court relied on the futility exception, reasoning: "The applications made by the Youngs have been futile. In fact, [p]laintiffs were informed by the City representatives that the historic designation meant their demolition permit was dead. The City admits that no 'historic' property, once designated, has ever subsequently been issued a demolition permit. [¶] After the demolition permit was denied, the Youngs submitted two more proposals. Both were rejected. Only after more than a year of trudging through the process with the City were the Youngs informed that the City would not allow any addition to the bungalow greater than the square footage of the original house. [¶] The actions by the City make any response by the Youngs futile because (1) relocation of the structure would be cost prohibitive and (2) per the City's subjective application of their rules, [p]laintiffs cannot meaningfully enlarge the existing 1074 square foot home. Significantly, the additional 1073 square feet the City would allow, will be reduced even further if the garage and covered patios or decks are involved in the alterations. Plaintiffs presented evidence that limiting a modified home to 2147 square feet results in a property that has no more value than the 1074 square-foot Spanish bungalow the City wrongfully took. The City presented no contrary evidence. Add to this fact the City's requirement that the Youngs comply with a costly EIR and a CEQA study, and you have the definition of futility. Because the Youngs have reached the point of futility, the Court rejects the City's argument that the matter is not ripe for review."

29

In addition to engaging in a mischaracterization of the record as to the Commission's treatment of demolition permits, these findings misperceive the inquiry on the "extremely narrow" futility exception. As stated, the responsible government agency must "as a practical matter define[ ]" the allowed development, creating the "inevitability" that refusal is certain or nearly so. (*Calprop Corp. v. City of San Diego*, *supra*, 77 Cal.App.4th at p. 594.) To apply the exception, the government entity responsible for the decision must be given an opportunity to explain the reach of its regulations, creating the potential that when it does so, the property owner may be left with an economically viable or beneficial plan. (Accord, *County of Alameda*, *supra*, 133 Cal.App.4th at pp. 569-570; *York v. City of Los Angeles*, *supra*, 33 Cal.App.5th at pp. 1195, 1196 [referring to the need for a final decision by the " ' "government entity charged with implementing the regulations" ' " or the "responsible agency"].) Plaintiffs did not provide the Commission this opportunity, having withdrawn all of their applications based on their subjective interpretation of City's staff's statements to mean that the Commission would reject any proposal increasing the structure to more than double its existing size. The evidence is that plaintiffs could have but never sought a final decision from either the Commission in the first instance or the City Council on appeal, through which they could have availed themselves of the hardship exception to a permit denial based on their or their property's unique circumstances.

Nor can we agree the record contains evidence that it was reasonably clear what the Commission would have decided, or that plaintiffs knew to a "reasonable degree of certainty" what development it would allow. As in *County of Alameda*, where the court rejected a similar argument, plaintiffs cannot make such a showing absent the Commission's final decision on the

30

point.  (*County of Alameda v. Superior Court, supra*, 133 Cal.App.4th at p. 569.)  Nor is this like circumstances presented in *Felkay v. City of Santa Barbara, supra*, 62 Cal.App.4th 30, where the government agency made clear what decision it would make through its actions in denying a coastal development permit as well as in rejecting the plaintiff's appeal and pursuit of a waiver.  (*Id*. at p. 40.)

On this record, as we acknowledged in *Calprop*, courts should not " 'be required to engage in "the virtual impossibility of determining what development will be permitted on a particular lot of land when its use is subject to the decision of a regulatory body invested with great discretion, which it has not yet even been asked to exercise." ' "  (*Calprop v. City of San Diego, supra*, 77 Cal.App.4th at p. 595, citing *Toigo v. Town of Ross, supra*, 70 Cal.App.4th at pp. 331-332.)  Because plaintiffs have not made a specific development proposal and received a final response to it from the responsible government agency, they may not contend that the Commission's decisions, or the historic preservation ordinance, make it futile to pursue further efforts to develop their land.  (*Calprop*, at p. 599.)

## DISPOSITION

The judgment is reversed.  The City of Coronado shall recover its costs on appeal.


                                                    O'ROURKE, Acting P. J.

WE CONCUR:



        IRION, J.



        KELETY, J.